## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SAMUEL MORGAN, | ) | |
| | ) | FILED: JUNE 11, 2008 |
| Petitioner, | ) | 08CV3378 |
| | ) | |
| v. | ) | Case No. JUDGE COAR |
| | ) | MAGISTRATE JUDGE BROWN |
| TERRY McCANN, | ) | |
| | ) | TC |
| in his official capacity as Warden, | ) | |
| Stateville Correctional Center, | ) | |
| Illinois Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

Petitioner, Samuel Morgan, by his undersigned attorneys, petitions this Court for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254.

In support of this Petition, Petitioner alleges and states as follows:

## I.    NATURE OF THE CASE

1.    In 1983, a Cook County jury convicted Samuel Morgan of two counts of first

degree murder, one count of rape, and one count of aggravated assault. The jury did this after

hearing the false testimony of two eyewitnesses, Phyllis Gregson and Elijah Prater – testimony

coerced through the preferential treatment given to Gregson on unrelated and undisclosed arrests,

and the physical and mental intimidation inflicted on Prater by the Chicago Police Department.

The jury heard a cold-blooded double murder story. The truth, as revealed by Prater's evidentiary

hearing recantation of his trial testimony, was that William Motley shot victim Kenneth Merkson

in execution style, and then in turn died when he shifted his aim to Morgan, who fired back in self

defense and the defense of others. Thus Morgan was convicted, and later sentenced by the judge, for a double murder he did not commit.

2.    None of this, however, came out at trial.

3.    This in significant part was due to the absence at key moments in the guilt phase of Morgan's trial of Lawrence Levin, a private criminal defense attorney Morgan's mother spent her entire life savings to hire.    In the days leading up to the trial, Levin repeatedly told the trial court that he had neither prepared for, nor could attend, Morgan's proceeding due to his commitments in, and exhaustion from, another murder trial. The trial court, however, forced Morgan to proceed, ordering Steven Decker, an inexperienced lawyer who neither associated with Levin in a law firm nor filed an appearance on Morgan's behalf, to choose the jury, give an opening statement and cross-examine four State witnesses before an exhausted Levin arrived in the courtroom. Levin later missed the cross-examination of three additional State witnesses.

4.    Levin's limited availability further rendered what assistance he did give wholly ineffective. Morgan suffers from significant brain damage and had ingested a large quantity of alcohol and other drugs on the day of the alleged crime. He had no memory of the events related to the fatal shootings. As a consequence, effective assistance of counsel required that Levin perform an extensive pretrial investigation to develop a defense from sources other than Morgan himself. Yet Levin failed to interview either of the two eyewitnesses against Morgan or develop facts that supported Levin's articulated theory that these two witnesses must have killed both victims. Thus, like the ineffective assistance the Supreme Court of Illinois later determined Levin rendered at Morgan's capital sentencing hearing, his defense at the trial's guilt phase equally failed to meet constitutional requirements.

5.     The State's wrongful pre-trial conduct further undermined Morgan's defense. Although given an explicit request to reveal information about witness Gregson's arrest and conviction records, the State withheld such records.  In doing so, the State hid the fact she had received preferential treatment in two unrelated arrests at the time of her testimony in Morgan's trial.  Further, as later uncovered by Morgan's post-conviction counsel, Chicago Police officers extracted Prater's false trial testimony only after an interrogation spanning four days in which he was handcuffed and stripped of clothing as well as threatened with physical violence and prosecution for the murders.  Compounding these fundamental procedural errors, the Illinois post-conviction and appellate courts failed to correct the clear *Brady* violations or to consider the recanted and corroborated testimony of Prater that demonstrated Morgan's innocence.

6.     Morgan's now 26-year wrongful incarceration must come to an end. He has spent over a quarter of a century exhausting the state remedies available to overturn his conviction and death (now commuted to natural life) sentence.  With this petition for a writ of habeas corpus, Morgan respectfully requests that the Court order the State of Illinois to conduct a trial in accordance with, and providing the protections of, the U.S. Constitution, or alternatively, order Morgan's release.

## II.    PARTIES

7.     Petitioner Samuel Morgan is currently confined in violation of his rights under the United States Constitution by the Illinois Department of Corrections at the Stateville Correctional Center in Joliet, Illinois.  His identification number is A81754.

8.     Respondent Terry McCann is the warden of the Stateville Correctional Center in Joliet, Illinois.  McCann is named pursuant to 28 U.S.C. § 2242 in his official capacity as Morgan's custodian.

### III.    JURISDICTION AND VENUE

9.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over Morgan's claims arising under laws of the United States, namely, 28 U.S.C. §§ 2241 and 2254.

10.    This Court has personal jurisdiction over Respondent because Respondent holds Petitioner within the State of Illinois.

11.    This Petition is timely filed within one year from the date on which his state court remedies were exhausted as required by 28 U.S.C. § 2244(d)(l)(A).

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 2241(d) because Morgan was convicted in a state court within this judicial district of the offenses for which he is presently unlawfully detained.

### IV.    PROCEDURAL HISTORY

13.    On February 5, 1982, Morgan was indicted in the Circuit Court of Cook County for two counts of murder in the January 28, 1982 deaths of William Motley and Kenneth Merkson and for the subsequent aggravated kidnapping and rape of Phyllis Gregson.  (C 1654-64.)[1]

14.    Morgan entered a plea of not guilty to all counts.

15.    At his trial and sentencing, Lawrence Wolf Levin ("Levin" or "trial counsel"), a private retained attorney, represented Morgan.  (C 1673.)  Although not retained to represent

---

[1] References to the Reports of Proceeding are designated as "TR" (Direct Appeal), "PTR" (Post-Conviction Appeal), and "STR" (Successive Post-Conviction Appeal.)  All 2005 Reports of Proceedings are from the New Sentencing Appeal and are identified by their date.

References to the Common Law Record are designated as "C" (Direct Appeal), "PC" (Post-Conviction Appeal), "SC" (Successive Post-Conviction Appeal), and "NSC" (New Sentencing Appeal.)

References to supplemental records are designated as "6/4/97 PSR 10/22/96 Tr." (Post-Conviction Appeal), "5/24/02 SR Part 1" and "SR Part 2" (Successive Post-Conviction Appeal) and "NSC-SR" (New Sentencing Appeal.)

Morgan, Steven Decker also appeared at trial on Morgan's behalf. Trial began on April 25, 1983. (TR 67.)

16.     On May 3, 1983, a jury convicted Morgan of two counts of murder as well as aggravated kidnapping and rape. (C 1712-15.) Elijah Prater and Gregson, the only eyewitnesses to the homicides, testified as State witnesses. Morgan did not testify at his trial.

17.     After the jury returned its verdicts, Morgan signed a waiver of his right to a jury at a capital sentencing hearing, and the jury was dismissed. (C 1717.)

18.     Judge Robert L. Massey then determined that Morgan was eligible to be sentenced to death pursuant to the multiple murder statutory aggravating factor, Ill. Rev. Stat. ch. 38, ¶ 9-1(b)(3) (1982). (C 1738-40.) On June 14, 1983, Judge Massey sentenced Morgan to death at the capital sentencing hearing. (C 1735-37.) Judge Massey also sentenced Morgan to extended terms of sixty years imprisonment for rape and thirty years imprisonment for aggravated kidnapping to run concurrently with the rape sentence. (C 1737; TR 1628-29.)

### Direct Appeal

19.     The court appointed the Office of the State Appellate Defender to represent Morgan on appeal. Pursuant to Illinois Constitution Article IV, Section 4(b), Morgan took a direct appeal, raising claims of prosecutorial misconduct, error in the trial court's qualification of prospective jurors and its consideration of irrelevant evidence, involuntary waiver of jury sentencing, and the unconstitutionality of the death penalty statute.

20.     The Illinois Supreme Court affirmed Morgan's convictions and sentence of death, but reduced the sentences for rape and aggravated kidnapping to 30 years and 15 years respectively. *People v. Morgan*, 492 N.E.2d 1303, 1319-20 (1986). Justice Simon dissented from the Court's decision to affirm the convictions and the sentence of death. *Id.* at 1320-22.

21.    Morgan next filed a petition for a writ of *certiorari* in the United States Supreme

Court, which the court denied on February 23, 1987.  The United States Supreme Court also

denied Morgan's petition for rehearing.  *Morgan v. Illinois*, 481 U.S. 1025 (1987).

### Morgan's Petition for Post-Conviction Relief

22.    On January 20, 1988, Morgan filed a Petition for Post-Conviction Relief in the

Circuit Court of Cook County.  (PC 13-20.)  Morgan, with the court's permission, later amended

that petition on July 28, 1993, and then again on July 3, 1995.  *See* Second Amended Petition for

Post-Conviction Relief (the "Second Amended Petition.")  (PC 84-772; SC 194-458.)  The Second

Amended Petition contained fourteen counts for relief based upon the following claimed violations

of his Constitutional protections:

a)    Morgan received ineffective assistance of counsel at trial and the eligibility

phase of the sentencing hearing due to trial counsel's (i) failure to obtain evidence relating

to Morgan's medical condition and mental state at the time of the events at issue, (ii) failure

to request discovery of exculpatory statements, (iii) failure to attend critical phases of the

trial, and (iv) failure to object to the State's improper argument.  (Counts I & II.)

b)    Morgan received ineffective assistance of counsel at sentencing due to trial

counsel's (i) failure to investigate or present evidence of Morgan's lifelong severe brain

damage, (ii) allowing Morgan to unknowingly waive his right to a sentencing jury, (iii)

failure to object to a deficient presentence investigation report, (iv) failure to object to the

State's use of false evidence, and (v) failure to object to improper argument.  (Count III.)

c)    Morgan's waiver of a sentencing jury was not knowing and voluntary and

was inconsistent with due process. (Count IV.)

- 6 -

d)    Morgan received ineffective assistance of appellate counsel due to appellate counsel's (i) failure to raise on direct appeal the ineffective assistance of trial counsel based on trial counsel's material misrepresentations regarding the non-unanimity requirement for a no-death verdict, the consequences of the non-unanimity requirement, and the consequences of the non-unanimity requirement on Morgan's decision to waive a jury for the death penalty hearing, and (ii) trial counsel's failure to object and correct the trial judge's admonition regarding the non-unanimity requirement and its consequences under Illinois law. (Count V.)

e)    The State's failure to disclose exculpatory evidence at trial, eligibility and sentencing violated Morgan's due process rights. (Counts VI-VIII.)

f)    The trial court's consideration of an inaccurate presentence investigation report violated Morgan's due process and equal protection rights. (Counts IX & X.)

g)    The State's presentation of false testimony in aggravation violated Morgan's due process rights. (Counts XI & XII.)

h)    The cumulative effect of the above listed violations constituted an independent constitutional violation. (Count XIII.)

i)    Lastly Morgan alleged that the Illinois death penalty statute is unconstitutional. (Count XIV.)

23.    On June 13, 1996, Judge Joseph Urso granted the State's motion to dismiss the Second Amended Petition on all counts except the portion of Count III in which Morgan alleged that his trial counsel's failure to investigate and present the mitigating evidence of Morgan's brain damage and medical condition denied Morgan effective assistance of counsel at sentencing. (PTR 228-33.) On that limited portion of one claim, the circuit court held an evidentiary hearing. (PTR

294-509.) After hearing uncontroverted expert evidence of Morgan's significant mental impairments at the time of the events at issue, and evidence of trial counsel's failure to present such evidence, the Court dismissed the Second Amended Petition on November 4, 1996. (PTR 514-19.)

## Illinois Supreme Court Orders New Sentencing Hearing

24.    Morgan then filed a direct appeal to the Illinois Supreme Court concerning denial of relief under the Second Amended Petition. (PC 1074-77.) On September 23, 1999, the Illinois Supreme Court affirmed Morgan's convictions but vacated his death sentence, holding that Morgan had received ineffective assistance of counsel at sentencing because of trial counsel's failure to investigate and present a large amount of mitigating evidence, including but not limited to Morgan's severe lifelong brain damage. *People v. Morgan*, 719 N.E.2d 681, 710-12 (1999). Specifically, the Court noted that Morgan has suffered from severe bilateral dysfunction of the frontal lobes of the brain since infancy. *Id.* at 710. Morgan also suffered from unremitting abuse as a child. *Id.* at 711.

25.    Morgan filed a petition for a writ of certiorari in the United States Supreme Court concerning his convictions, which was denied on March 20, 2000. *Morgan v. Illinois*, 529 U.S. 1023 (2000).

26.    On May 5, 2000, the Illinois Supreme Court issued its mandate to the Circuit Court of Cook County, vacating Morgan's sentence of death and directing that court to conduct a new sentencing hearing. (SC 719-70.)

27.    On May 26, 2000, Morgan filed a motion in the circuit court for substitution of judge, both as of right and for cause. (SC 771-88.) On July 5, 2000, Judge Joseph Urso granted

Morgan's motion for substitution of judge as of right.  (SC 829.)  On July 7, 2000, his case was

assigned to Judge Mary Ellen Coghlan.  (STR 41-42.)

**<u>Successor Petition for Post-Conviction Relief and Petition for Relief from Judgment</u>**

28.     On October 19, 2000, while various pre-sentencing hearing matters were pending

before the circuit court, Morgan filed his Successor Petition for Post-Conviction Relief and

Petition for Relief from Judgment (the "Successor Petition") in the circuit court, claiming due

process violations under the Illinois and United States Constitutions based upon a freestanding

claim of actual innocence; due process violations under the state and federal constitutions based

upon the State's knowing use of perjury; and due process violations based upon the State's

suppression of material exculpatory evidence.  (SC 859-904.)

29.     In support of the Successor Petition, Morgan submitted the September 26, 2000

Affidavit of Elijah Prater, which contained newly-discovered evidence directly contradicting

Prater's trial testimony.  (SC 885-90.)

30.     On March 22, 2001, Morgan filed a motion for leave to file an Amended Successor

Petition for Post-Conviction Relief (5/24/02 SR Part 1 at 27-33), which included new allegations

of the State's undisclosed favorable treatment of the other eyewitness in this case, Phyllis Gregson,

(5/24/02 SR Part 1 at 28-29), uncovered as a result of Morgan's counsel exhaustive investigation

of old police records.  (5/24/02 SR Part 1 at 29-30.)  On April 6, 2001, the circuit court granted

Morgan's motion for leave to file the amended pleading, but barred Morgan from presenting at the

evidentiary hearing any evidence or claims from the Amended Successor Petition that were not

contained in the Successor Petition.  (SC 1018-19; STR 155-56.)

31.     In September and October 2001, the circuit court conducted an evidentiary hearing

on Morgan's Successor Petition.  (STR 198-363; 5/24/02 SR Part 2 at 2-75; STR 365-586.)  At the

evidentiary hearing, Elijah Prater recanted his trial testimony in open court under oath. (STR 200-323.) Pursuant to its earlier order, the court heard no evidence concerning allegations in the Amended Successor Petition that the State failed to disclose its favorable treatment of Phyllis Gregson. (STR 156; SC 1018-19.)

32.    On October 29, 2001, the circuit court denied all of Morgan's claims under the Successor Petition. (STR 661-85.)

33.    Morgan appealed the circuit court's decision directly to the Illinois Supreme Court. On January 10, 2002, that court granted a motion to stay Morgan's resentencing pending his appeal. (NSC 275.) In his appeal, Morgan argued that the circuit court erred in its ruling on Morgan's claims of actual innocence, based on Prater's recantation and the court's refusal to hear Morgan's newly-discovered evidence regarding eyewitness Gregson. More specifically, Morgan argued that:

    a)    The court should vacate his convictions because the evidence strongly supported his freestanding claim of actual innocence;

    b)    Newly-discovered evidence showed that the State violated Morgan's due process rights as a result of its knowing use of perjury;

    c)    Newly-discovered evidence showed that the State violated Morgan's due process rights as a result of its failure to disclose material, exculpatory evidence; and

    d)    Morgan was entitled to relief from judgment pursuant to Section 2-1401 of the Illinois Code of Civil Procedure.

### Clemency and Appeal of Successor Petition

34.    While Morgan's appeal of Judge Coghlan's denial of relief under the Successor Petition was pending, Governor George Ryan granted Morgan clemency in January 2003,

removing the death penalty as a sentencing option for Morgan, and simultaneously granting

clemency to all inmates on death row in Illinois.  (NSC-SR 262.)

35.     Illinois Attorney General Lisa Madigan filed a petition in the Illinois Supreme

Court for a writ of mandamus challenging that grant of clemency to Morgan and other similarly-

situated prisoners whose previous death sentences had been vacated but who had not yet been

re-sentenced.  On January 23, 2004, the Supreme Court denied her petition and upheld those grants

of clemency, including Morgan's, finding them constitutional under the Illinois Constitution.

*People ex rel. Madigan v. Snyder*, 804 N.E.2d 546, 560 (2004).

36.     On September 23, 2004, the Illinois Supreme Court denied Mr. Morgan's appeal

from the denial of his successive post-conviction claims, affirmed his convictions, and ordered that

the stay of his new sentencing hearing be lifted upon issuance of its mandate.  *People v. Morgan*,

817 N.E.2d 524, 533 (2004).

37.     Morgan subsequently filed a petition concerning his convictions to the United

States Supreme Court for a writ of *certiorari*, which was denied on February 22, 2005.  *Morgan v.*

*Illinois*, 543 U.S. 1167 (2005).

### Resentencing

38.     Upon issuance of the mandate and remand by the Illinois Supreme Court, the case

was assigned to Judge Rickey Jones of the Circuit Court of Cook County.

39.     On July 28, 2005, Morgan filed a comprehensive Memorandum Concerning His

Resentencing (accompanied by a three-volume appendix that collected portions of the prior record

in the lower court), which presented the vast amount of mitigating evidence that had never before

been presented to a court charged with sentencing Morgan, including the evidence of Morgan's

actual innocence.  (NSC-SR 40-1379.)

40.    On August 1, 2005, granting Morgan's motion, Judge Jones ordered that a new Presentence Investigation Report be completed.  (August 1, 2005 Report of Proceeding at 6-7.)

41.    Even so, at a routine status hearing held on September 19, 2005, and without prior notice to Mr. Morgan or his counsel, and without hearing any evidence, reviewing the record or the arguments presented in Morgan's resentencing memorandum and accompanying appendix, or reviewing the new Presentence Investigation Report prepared pursuant to his earlier order, Judge Jones sentenced Morgan to natural life imprisonment.  (September 19, 2005 Report of Proceedings ("9/19/05 Tr.") at 11; *see also* NSC 440-73.)

42.    In addition to this irregularity of sentencing Morgan at a status hearing and not at an actual sentencing hearing where Morgan's counsel would have been prepared to address sentencing, the circuit court did not advise Morgan of any of his rights on appeal as required by Illinois Supreme Court Rule 605.  (*See* 9/19/05 Tr. at 4-11.)  Morgan filed a motion to reconsider the circuit court's sentencing order on October 19, 2005.  (NSC-SR 2-39.)

43.    On November 22, 2005, the circuit court tardily advised Morgan of his rights under Illinois Supreme Court Rule 605, but otherwise denied Morgan's motion to reconsider. (November 22, 2005 Report of Proceedings at 9-11.)

44.    On December 12, 2005, Morgan appealed the circuit court's September 19, 2005 and November 22, 2005 orders to the Illinois Appellate Court, First District, seeking to have the court vacate his sentence of natural life in prison and remand the matter to the Circuit Court of Cook County for a full sentencing hearing, as ordered by the Illinois Supreme Court.  The appeal was rejected on August 20, 2007. *People v. Morgan*, 875 N.E.2d 6, 10 (Ill. App. Ct. 2007).

## V.    <u>FACTS</u>

45.    Early in the afternoon of January 27, 1982, Morgan, Kenneth Merkson, and William Motley were with Elijah Prater in Prater's apartment at 1627 West Lawrence Avenue in Chicago. (TR 708-09; STR 214-16.) At that time, Prater sold and distributed illegal drugs out of his apartment, often working with Phyllis Gregson who also distributed illegal drugs and provided Prater with "business" contacts, including a chemist who manufactured PCP. (PC 466 ¶ 5; SC 315 ¶ 2; STR 212, 217.) Prater had known Morgan for years. (STR 212-16.) Morgan, however, had only recently introduced Motley and Merkson to Prater – albeit by their nick names, "Satan" and "Ken San" – referring to them as "stick-up" men Morgan had known in prison. (SC 901 ¶ 5; STR 360.) On the afternoon of January 27, the four of them "got high." (STR 217-18.)

46.    Later that evening, Lemuel Bell and John Gilbert, who was also known as "Ba Ba," went to Elijah Prater's apartment. (SC 902 ¶ 8; STR 361.) As Bell remembers the events, when he and Ba Ba arrived, Morgan and Phyllis Gregson were present. (SC 902 ¶ 8; STR 164, 361.) Prater, however, stated that Motley, Merkson and Prater also were present, and that the three, and Ba Ba, left to collect money owed for drug debts. (STR 215-16.) In any event, Bell recalls that Ba Ba, Morgan, Gregson and he consumed marijuana and cocaine in an atmosphere Bell described as "peaceful." (SC 902 ¶ 8; STR 361-62.)

47.    Motley, Merkson and Prater, meanwhile, traveled around the city and collected approximately $2300 to $2500 in cash. (STR 216.) Motley carried a .357 magnum while they did so (STR 216) – a gun Bell had provided either a few days before (according to Bell (SC 901-02 ¶ 6; STR 360-61) or earlier that afternoon (according to Prater (STR 215).) The three of them returned to Prater's apartment some time after midnight. (STR 216; SC 902 ¶ 8; STR 362.) All the persons in the apartment except Prater then got high on mushrooms, marijuana, cocaine,

mescaline, and PCP; Prater got high on marijuana and cocaine. (STR 217-18; SC 902 ¶ 8; STR 362; PC 466 ¶5.) After a while, Ba Ba and Bell left the apartment, (SC 902 ¶ 8; STR 362), leaving behind Bell's address book with a black cover. (SC 902 ¶ 7; STR 360-61.) Gregson, Prater and Morgan went into the apartment's bedroom, where Prater fell asleep. (STR 218-19.)

48.      Morgan, however, stayed up throughout the night. (SC 316 ¶ 7.) He repeatedly called his girlfriend, Rosemary Thomas, in a very troubled state, asserting that devils and demons were after him. (PC 453 ¶ 10; SC 316 ¶ 7.) Later that morning, Morgan similarly told Prater and Gregson, who had then come in the apartment's kitchen to eat (STR 219), that he had forced himself to stay awake because he believed that Motley planned to "try something," (STR 229), and more specifically, that Motley and Merkson were going to kill him. (SC 316 ¶ 7.) Gregson said she too was afraid of Motley and Merkson. (PC 466 ¶ 5.)

49.      At that point, Motley and Merkson, who were in the apartment's living room, began arguing. (STR 229-30.) Motley suddenly hit Merkson, forced him to his knees in the apartment dining room, and then shot Merkson in the head with the .357 magnum. (STR 230-31.) At that point, Morgan went from the kitchen into the dining room carrying a shot gun that either Motley or Merkson earlier had taken out of a closet. (STR 230, 233; PC 466 ¶5.) Motley pointed the .357 magnum at Morgan, who shot Motley in the chest with the shotgun. (STR 233-35.) A diagram of Prater's apartment is shown below.



50.     Morgan then took the .357 magnum from Motley's body.  (STR 235.)  Prater and Gregson cleaned up the bodies, and afterwards, Prater left to buy gas and liquor.  (STR 234-35.)  On his return, and approximately two to three hours after Merkson and Motley had been shot, Prater observed that Morgan was not in his proper state of mind as a result of drugs that Morgan had taken.  (STR 240-41.)  Prater began to tie up Merkson's body.  (STR 239-40.)  Close by in the dining room, the shotgun rested on a pillow.  (STR 239-40; SC 2292.)  Suddenly, as Prater turned to get a bag, Morgan shot at Prater, who quickly fled out the back door of the apartment.  (STR 240-42.)

51.     Soon thereafter, Prater contacted Bell.  (SC 902 ¶ 9; STR 345-46.)  He recounted how Motley and Merkson's deaths had occurred, saying that "Satan" and "Ken San" were going to rob Morgan and Prater, but that "Satan" and "Ken San" had a falling out between each other at the apartment and, as a result, "Satan" shot "Ken San."  (SC 902 ¶ 9; STR 346-47.)  Prater then told Bell that Morgan had "saved the day" by then shooting "Satan."  (SC 902 ¶ 9; STR 346.)

52.     Prater also told Bell about how Prater had run from the apartment after the shot

Morgan had taken at Prater. (SC 902 ¶ 9; STR 347.) Prater said that he believed that Morgan may

have taken a shot at him because Morgan thought that Prater was making a wrong move or about

to pick up a gun. (SC 902-03 ¶ 9; STR 347.)

## The Chicago Police Investigation

53.     On the afternoon of January 28, 1982, Chicago police officers responded to a call of

shots being fired at 1627 West Lawrence Avenue. (TR 503-06.) They found Motley and Merkson

dead in the otherwise vacated apartment. (TR 511-12, 969, 974.) The scene photographed by

evidence technicians showed Merkson lying in the dining room, dead from a bullet wound to the

head, and Motley close by at the entrance to the dining room, dead from a shotgun blast to the

chest. (STR 283, 387-90: SC 2288; SC 2292.) The photographs of the living room further showed

a clean love seat couch; no blood stains or spatters of any kind are visible on either the love seat or

the living room walls or floor surrounding the love seat . (STR 248; SC 2288.)

54.     The following morning, a Chicago police officer from the 21st District on the south

side arrested Morgan for possession of a controlled substance and unlawful use of a weapon. (C

1640-41.) Further police investigation indicated that the police sought Morgan for questioning in

the Motley and Merkson homicides. (C 1640-41.) As recounted by Rosemary Thomas, Morgan's

girlfriend who went to the police station the night of Morgan's arrest, the police officers remarked

that Morgan had the mental state of an insane "madman." (SC 453-55 ¶¶ 10, 11, 15.)

55.     Prater soon learned that the police wanted to question him concerning the deaths in

his apartment. (STR 243.) Consequently, Prater, accompanied by his attorney, turned himself into

the Chicago Police Department at Area 6 (Belmont Avenue) station. (STR 249.) Prater's attorney

left after instructing Prater not to say anything to the police. (STR 249.)

56.    At that point, detectives stripped Prater of his clothes in an interrogation room, put a white plastic foam "bubble wrap" gown over him, handcuffed him to the wall, and left him there for a prolonged time. (STR 251-52.) As Prater's girlfriend, Cynthia Ruwe, later testified, she saw Prater through a window that night at the Area 6 police station, and she noticed that he "was wrapped in this white thing like. He didn't have any clothes or shoes on . . . ." (5/24/02 SR Part 2 at 53.) Evidence technicians Frank DeMarco and Robert Reese also clipped Prater's fingernails. (5/24/02 SR Part 2 at 33-34; SC 1188.) While the police later claimed that Prater was free to leave at any time (STR 250-51, 260), no one told the handcuffed and stripped Prater, whom DeMarco described as an "in custody" "arrestee," that Prater was free to do so. (STR 250; 5/24/02 SR Part 2 at 33-34: SC 1188.) As a consequence, Prater stayed at the police station for two to three days until the police released him only after obtaining his grand jury testimony. (STR 250.)

57.    When interviewed on the night of January 30, 1982, Prater tried to tell the police what had actually happened in his apartment on January 28, 1982. (STR 256-57.) The police, however, showed no interest in Prater's description of the events. The police told Prater that Gregson – who the police had interviewed earlier on January 30 (STR 254-57, 305, 310-11) – had claimed that Morgan had murdered the two men. (STR 248-60.) Although Prater attempted to give a true account of the January 28 events, "[the police] would always stop [Prater] and tell [him], well, Phyllis said this happened." (STR 257.)

58.    The detective then said to Prater (an African-American man) that he could go along with Gregson's story, or if not, a white woman, Gregson, would label him a liar, and the police would charge him along with Morgan for the murders. (STR 305.) An attorney from the state's attorney's office reiterated this threat when he looked into the room and said that Prater should be charged. (STR 255.) Later, a detective told Prater that once he was indicted, his lawyer would

charge him $10,000 to $20,000 – something Prater could not afford – to prove his innocence. (STR 254, 305.)

59.     The police also told Prater that they would put him in the same cell with Morgan, stating that Prater "knew [what] the consequences" of that would be. (STR 255.) The police further intimated to Prater that he should be scared of being placed in the same cell with Morgan because Morgan would assault Prater and make him his "girlfriend" (SC 973 ¶ 12); because Morgan had shot in Prater's direction (STR 255); and because the police would lead Morgan to believe that Prater was implicating him. (STR 254-55.) This police interrogation tactic finally worked and "[u]ltimately [Prater] ended up going the way that [the police] said it, what happened." (STR 257.) At that point, the State had Prater testify to the grand jury. (SC 2269-79.)

60.     Bell spoke with Prater a few days after the police had released Prater. (SC 903 ¶ 10; STR 348.) Prater stated that the police had scared and intimidated him, and left Bell with the belief that Prater had made a deal with the police not to be charged. (SC 903 ¶ 10; STR 347-48.)

61.     As for Gregson, after the events of January 27-28, 1982, but long before Morgan's trial, Gregson told Prater that she agreed to have sex with Morgan and that he did not rape her. (STR 258-59, 264.) Gregson further told Prater that the police had coerced her, and told her when they interrogated her that if she said Morgan raped her it would help them put Morgan in jail. (STR 264.) Gregson passed away in 1995 (STR 572), after multiple arrests for drugs, theft, and prostitution violations (SC 989-95), and before she could be confronted with Prater's statements. Even so, shortly before her death, she provided an affidavit in which she stated, "Sam was always a gentleman. He was quiet and friendly. He never said anything rude or sexual to me." (PC 466 ¶ 4).

## Morgan's Trial Counsel Fails to Conduct a Pretrial Investigation

62.    Morgan's mother, Josephine Rogers, paid Lawrence Wolf Levin $10,000 to represent her son, who in turn filed his appearance as Morgan's attorney on February 23, 1982. (C 1673.)  That same day, Levin filed a Motion for Discovery and Inspection, (C 1676-81), seeking disclosure of:  "*Any* record of prior criminal *convictions* or prior criminal *arrests* which may be used for impeachment of the defendant or any person whom the State intends to call as witnesses at the hearing or trial of this cause."  (C 1677 ¶ 9) (emphasis added.)  In that motion, Morgan also requested that the State identify its witnesses for trial.  (C 1678 ¶ 13.)

63.    In her brief and infrequent conversations with Levin over the next year at status hearings in court, Morgan's mother informed Levin that Morgan had a history of seizures (PTR 327-30; PC 463 ¶ 22), and that she thought her son might have suffered a seizure when Motley and Merkson were killed.  (PC 463 ¶ 22.)

64.    More specifically, and as developed by Morgan's post-conviction counsel, Morgan suffers from permanent and severe organic brain damage which likely resulted from meningo-encephalitis – an infection of the brain – that was diagnosed when he was 20 months old.  (PC 322 ¶ 10; PC 326 ¶ 19; 6/4/97 PSR 10/22/96 Tr. at 35-37, 41, 46, 77-78, 82, 166-67.)  He has definite and severe damage to both sides of his frontal lobe, damage to the left temporal parietal hemisphere of the brain, diffused damage throughout the brain, and deep sub cortical deterioration. (PC 322 ¶ 10; PC 324-26 ¶¶ 15-19; 6/4/97 PSR 10/22/96 Tr. at 45, 66-68 77-80, 166.)  Morgan's brain damage results in grand mal seizures and a condition known as grand mal epilepsy, and the left temporal parietal damage also impairs Morgan's memory functions.  (6/4/97 PSR 10/22/96 Tr. at 35, 40-44, 82.)

65.     Morgan also has a history of head injuries.  For a number of years when he was a child, he engaged in violent episodes of slamming his head during epileptic seizures caused by his brain damage. (6/4/97 PSR 10/22/96 Tr. at 47, 77-82, 167-68; PTR 303-19.)  Also, when he was nine years old, a car ran into Morgan, knocking him several feet into the air, and causing him to land on his head. (6/4/97 PSR 10/22/96 Tr. at 46 ; PTR 315-16.)  When he was 12 or 13, he fell off a second floor porch and hit his head on concrete while attempting to protect his sister from an attacker. (PTR 316-17.)  And when he was 15 or 16, a police officer hit Morgan on the head with the butt of a gun. (PTR 317-18.)

66.     Morgan also became an alcoholic at the age of 11 or 12.  (PC 324 ¶ 14; PC 414 ¶ 99.)  This chronic substance abuse greatly exacerbated his cognitive impairment. (6/4/97 PSR 10/22/96 Tr. at 90-91.)

67.     Because of his brain impairments, and his use of many intoxicating and mind-altering substances at the time of the homicides at issue in this case, Morgan lacks, and has always lacked, any memory of the events that took place on January 27 and 28, 1982. (SC 1076-81.) Morgan, therefore, could not provide assistance in his own defense. (SC 1076 -81.)

68.     Even so, Levin took little note of Rogers' comments regarding Morgan's seizure history, nor sought any aid from Rogers and Ruby Roberts, Morgan's sister, who routinely attended Morgan's court hearings. (PTR 327-32.)  Instead, Levin told Rogers and Roberts not to worry about Morgan's inability to provide assistance with his defense "because the two witnesses for the State were junkies." (PC 463 ¶ 22.)

69.     That assumption formed the full extent of Levin's pre-trial investigation.  As noted, he did not inquire any further about Morgan's seizures, health, or background. (PTR 336-38.) Similarly, Levin failed to interview Rosemary Thomas, Morgan's girlfriend who spoke to Morgan

throughout the night of January 27-28 and was at the police station the night of Morgan's arrest. (PC 453-55 ¶¶ 10, 11, 15.)

70.    Levin also never spoke to either Gregson or Prater before Morgan's trial. (SC 316 ¶ 8.) Gregson was in Morgan's presence for almost twenty consecutive hours, before, during, and after all the offenses with which he was charged. (TR 988-1155.) Prater was in Morgan's presence for over twelve consecutive hours during this time period. (TR 705-913.)

71.    Compounding this failure of investigation, Levin also failed to make discovery requests beyond those he perfunctorily filed on the day he was engaged. Thus he did not seek, for example, unrecorded exculpatory witness statements taken by the State. If he had, Levin would have discovered (absent additional misconduct by the State), that: (i) Prater told police that Morgan had forced himself to stay awake on the night and morning of January 27 and 28, 1982 because he believed that Motley and Merkson were going to kill him; (ii) Morgan spoke to his girlfriend, Rosemary Thomas, on the telephone throughout that night; (iii) Gregson had stated that she was afraid of Motley and Merkson; and (iv) Prater was selling drugs out of his apartment.

72.    It is also clear that Levin did not adequately review the materials he had received from the State. In particular, Morgan's 1978 pre-sentence investigation report alluded to Morgan's brain impairment. (PC 613.) A reasonably competent defense counsel would have viewed this information, along with the statement made by Morgan's mother that Morgan may have suffered a seizure at the time of the homicides, as a sign that he needed to conduct further investigation into Morgan's mental state. Levin did not undertake any such investigation.

73.    Further, a close review of the police photographs of the scene, and especially the location of the bodies, provided obvious impeachment of testimony later offered by the State – impeachment Levin never attempted to establish.

## The State Serves False Discovery Responses

74.    On June 18, 1982, the State answered Morgan's February 23, 1982 discovery

motion seeking the arrest and conviction records of the State's witnesses. (C 1682-86.) In that

pleading, the State disclosed Gregson as a trial witness but omitted any arrest information,

asserting that: "The People have no knowledge at this time that any of its potential witnesses have

any criminal convictions." (C 1683; C 1685 ¶ 9.)

75.    The truth, however, was that the People did have such knowledge.

76.    Gregson had a criminal history. On April 16, 1982, months after the deaths of

Motley and Merkson, but before the State's answer to Morgan's discovery request and his trial, the

Chicago Police Department arrested Gregson and charged her with one count of Possession of a

Controlled Substance, a felony, and one count of Possession of Cannabis. (SC 955-56 ¶¶ 63; SC

993.)

77.    On May 3, 1982 - - again before the State answered Morgan's discovery request - -

the Chicago Police Department again arrested Gregson, this time with Lawrence Froio, and

charged them each with two counts of Possession of a Controlled Substance and one count of

Possession of Marijuana. (SC 957 ¶ 67; SC 993.) According to Froio's and Gregson's Chicago

Police Department arrest reports, both Froio and Gregson appeared in court on May 27, 1982

concerning their May 3, 1982 arrests, and, according to Froio's criminal history and Froio's arrest

report, the matter was continued until either August 26 or August 27, 1982. (SC 956 ¶ 64; SC 957

¶¶ 67-68; SC 995-99.)

78.    Neither the criminal history nor the arrest report for Gregson indicated the

disposition of the felony charges against Gregson. (SC 957 ¶ 67; SC 989-91, 993.) Froio,

however, stated that both Gregson and he negotiated a guilty plea to their May 1982 arrests and

received sentences of six months' supervision. (SC 1014 -15 ¶¶ 6, 9-13; SC 957, 997.) The State, however, revealed none of this.

79.     In fact, Morgan did not learn of Gregson's record until 2000 when the State, pursuant to a subpoena issued as part of Morgan's post-conviction proceedings, produced Gregson's criminal history and the Chicago Police Department provided Gregson's April 16, 1982 arrest report, Gregson's May 3, 1982 arrest report, Froio's criminal history and Froio's May 3, 1982 arrest report. (SC 955-56 ¶ 63-64; SC 957 ¶ 67; SC 995.)

### The Court Admonishes Levin For His Failure of Pretrial Preparation

80.     Levin's in-court performance – or rather lack of such performance – further evidenced his failure to work on Morgan's case. Between the time he was retained and the beginning of Morgan's trial, Levin was frequently absent from, and sought numerous extensions of, scheduled court proceedings. Frequently, attorney Steven Decker appeared at Morgan's court hearings in Levin's absence although not retained to represent Morgan. (TR 52-55, 59-60.) Decker admittedly did not prepare himself to assume Levin's responsibilities. (TR 54.)

81.     As Morgan's often postponed trial date came closer, the trial judge, the Honorable Robert J. Massey, repeatedly admonished Levin for his failure to prepare himself to defend Morgan. For instance, on April 18, 1983, Judge Massey chastised trial counsel for not paying attention to Morgan's defense:

> It is more than twenty times that this [case] has been up and it should be on trial. . . .
> [T]his being a murder charge, [it] should get some priority in sense of getting to trial.

(TR 54.)

82.     At that appearance, Judge Massey indicated his misperception that Decker was going to try this case. Decker responded that he didn't "think [he] informed [Judge Massey] of that" but that he "may be assisting Mr. Levin during the trial of this case." (TR 54.) Later that

same afternoon, Decker again informed Judge Massey that it was Levin, and not Decker, who was going to try the case.  (TR 59-60.)

83.    Later, after yet another continuance due to Levin's absence in court, Judge Massey said to the once-again-pinch-hitting Decker that Judge Massey was at the end of his rope with Levin's lack of preparedness:

> We will hold this case on call until tomorrow at 10:00 o'clock and I want you or Mr. Levin, or both of you to come in here even if he is on trial in another court upstairs, I want you in here because *I think he owes a duty to his client* and also to this Court, *knowing that this case is going ahead to trial*. . . . So, you inform Mr. Levin of what I am saying, that I want him in here.

(TR 60) (emphasis added).

84.    The next day, Levin appeared before Judge Massey to explain that he remained unprepared to defend Morgan because he was on trial before another judge.  (TR 63.)  When Judge Massey insisted that Morgan's trial begin immediately after that trial, Levin reluctantly agreed.  In doing so, Levin conceded that his exhaustion would compromise his defense of Morgan as shown by the following colloquy:

> **THE COURT:**  [Can you] [b]e ready to go with evidence right after you complete that case?
>
> **MR. LEVIN:**  No, Judge, quite honestly, outside of the fact attempting to try two cases of this importance together, [I have] almost been continuously on trial for the past three weeks.  I just finished a jury Thursday night before Judge Berkos which was People versus Cowan.
>
> **THE COURT:**  Is there any reason why you cannot proceed with this case right after you are finished then, because you are ordered to be on trial in this case?
>
> **MR. LEVIN:**  No, no reason why I can't, save for [the] burnout factor.

(TR 63-64.)

## The Trial

85.    As he had warned, Judge Massey commenced Morgan's trial on April 26, 1983, immediately after Levin's previous jury trial concluded. (TR 67-68.)  Although Levin sat at the defense table as Morgan's preliminary trial proceedings began, he soon disappeared from the court during part of jury selection, without explanation to any of the State's attorneys or the judge. (TR 345-455.)  As following colloquy makes clear, Decker had not prepared to defend Morgan, had not received instruction from Levin, and was not in a position to compensate for Levin's abandonment of a client facing a capital murder trial:

> **THE COURT:**  Mr. Decker, where is Mr. Levin?
>
> **MR. DECKER:**  Mr. Levin asked me if I could finish selecting the jury for him this afternoon.
>
> **THE COURT:**  The selection of the jury, we have got some witnesses that the State has ready to put on.
>
> **MR. DECKER:**  I was going to ask the Court if it doesn't appear that the jury is going to be selected among the individuals –
>
> **THE COURT:**  We are getting some others here.
>
> **MR. DECKER:**  I understand that the State rejected the last panel.  If it takes sometime to select the others, could we possibly start the evidence tomorrow?
>
> **THE COURT:**  We can complete it today.  We have some witnesses we can at least start it with whatever witnesses we have to move forward.  Mr. Levin never indicated to this Court that he had any other appointments any place else.  He knows he's on trial.
>
> **MR. DECKER:**  This doctor's appointment that he had.
>
> **THE COURT:**  He never informed this Court of this fact.
>
> **MR. DECKER:**  He was unable to attend to it yesterday afternoon.
>
> **THE COURT:**  At any rate, you indicated earlier that you were working with Mr. Levin in the defense of this?
>
> **MR. DECKER:**  Right.

**THE COURT**: Of this defendant, Samuel Morgan?

**MR. DECKER**: Correct.

**THE COURT**: So you will proceed then?

**MR. DECKER**: I'm just asking the Court if the Court would just consider doing the evidence, start all the evidence tomorrow.

**THE COURT**: I don't know how many witnesses they have or how many we will get to. I'm sure that the first couple are just life and death.

**MR. SCHULTZ [prosecutor]**: The first one is a tenant in the same building. That will be relatively short; and the second one is the reporting officer. Our concern, so the record is clear, is that this case has been held on day by day now, and this is the second week this case started to be held on since, I believe, April 18th because Mr. Decker and Mr. Levin were on trial in Judge McElligott's courtroom. At no time during last week or this week until about a half hour ago when this Court adjourned for a short lunch break were we made aware that Mr. Levin was first going to leave regardless of what the Court did.

**THE COURT**: He never said a word to this Court about leaving.

**MR. DECKER**: Given the fact, the State's representations as to the witness who is a tenant underneath the apartment where this incident allegedly occurred, that is not highly significant testimony and the reporting officer –

**MR. LINN [prosecutor]**: We have the evidence technician.

**MR. DECKER**: Let's see if we can get through with those two first; the evidence technician is a different situation.

* * *

**THE COURT**: . . . Samuel Morgan, you understand Mr. Decker is continuing to represent you at this point?

**DEFENDANT MORGAN**: Yes, to continue to pick the jury, right?

**MR. DECKER**: Yes.

**THE COURT**: And whatever other witnesses we put on today he'll go forward with it.

(TR 345-48.)  The trial judge then continued the *voir dire*.  (TR 348.)  Morgan never indicated that he had expected Decker to proceed with opening statements and witnesses' testimony without Levin.

86.     Even so, that afternoon, and in Levin's absence, Decker gave a brief opening statement in which he set forth the sole defense theory – that the State's witnesses to the crime, Prater and Gregson, committed the homicides, not Morgan.  (TR 469-72.)  At no point in his brief statement did Decker even make passing reference to the existence or relevance of the fact that Morgan was severely brain-damaged.

87.     Decker was then forced to cross-examine the State's first two witnesses: Frank Blume, Prater's downstairs neighbor who called the police when a bullet came through his ceiling, (TR 489), and Amy Bagans, the police officer who first arrived at the homicide scene and who testified about police photographs taken at the crime scene. (TR 526.)

88.     The next day, Levin once again was absent from the courtroom -- an absence that came as a surprise to Morgan, Judge Massey, and even to attorney Decker:

> **THE COURT:**  Mr. Decker, you are still representing Samuel Morgan here this morning in the trial of this case.  And, yesterday, Mr. Levin just did not appear right after the morning hour.  And, without saying anything to the Court, he never came back.  You did.
>
> And I realize you told me previously that you were representing him, too, Samuel Morgan, but we are going on at this point, and Mr. Levin still is not here, and it is now eleven-forty-five a.m.
>
> I do not know whether he intends to come in to represent him, or not.  I think you said he might come in later.
>
> **MR. DECKER:**  I thought he was going to be here.  I have not been able to speak to him this morning.
>
> **THE COURT:**  Of course, Mr. Samuel Morgan understands that he is aware of that fact, is that correct?

**THE DEFENDANT:** You know, just at the present, I am just becoming aware of it.

(TR 550-51.) The judge then told Morgan that he had Decker there to proceed with the trial, and, prompted by the judge without being given any other options, Morgan indicated that he understood and that this was "agreeable." (TR 551-52.)

89.    Thus, due to Levin's unexplained absence, on April 27, 1983, Decker proceeded with the cross-examination of the State's next two witnesses: Paul Zacharias, a police officer who testified that Morgan had previously used the alias Joseph Thurston (TR 553-90), and John Dudek, the police officer who arrested Morgan on January 29, 1982. (TR 590-615.) Officer Dudek was a key witness, as he had the opportunity to observe Morgan's physical and mental state shortly after the events at Prater's apartment.

90.    On May 2, 1983, Levin was again absent from the trial and missed the cross-examination of the State's last three witnesses: Ernest Warner, firearm technician for the Chicago Police Department Crime Lab (TR 1157-68), Maemell Bland, manager of the Shore Drive Motel (TR 1168-89), and Tommie Lee Cowans, engineer at Shore Drive Motel. (TR 1189-1222.) Bland and Cowans were also key witness as they had the opportunity to observe Morgan's physical and mental state shortly after the events at Prater's apartment.

91.    In sum, Levin was absent from court during the following stages of Morgan's trial: part of voir dire (TR 345-455); arguments on the admissibility of certain evidence (TR 456-61); opening statements (TR 462-72); the first four witnesses in the State's case-in-chief (TR 473-590); and during the examination of the last three witnesses in the State's case-in-chief. (TR 1157-1261.)

- 28 -

## The State Relies on Coerced Testimony at Trial

92.     Elijah Prater served as a key witness for the State in its case-in-chief against
Morgan. As he later admitted in an affidavit and at a post-conviction hearing, however, Prater
falsely implicated Morgan in his testimony at Morgan's trial. (STR 210-11; SC 973 ¶ 12.)

93.     At trial, Prater claimed that Morgan, Motley, and Merkson came to Prater's
apartment early in the afternoon of January 27, 1982, where the four of them ingested marijuana
and cocaine. (TR 710.) Prater, Motley, and Merkson then left Morgan in Prater's apartment until
the early morning hours of the next day. (TR 711-12.) While they were away from the apartment,
Motley carried around a .357 magnum. (TR 713-14.) When Prater returned to his apartment with
Motley and Merkson, they found Morgan with Gregson. (TR 714.) All five of them used illegal
drugs once again. (TR 714-16.) After they had used drugs, Morgan called Prater and Gregson into
a room where Prater claimed at trial that Morgan had knocked Gregson to the ground (TR 717-18,
757) – a claim at odds with Gregson's statement that Morgan had been quiet and friendly. (PC 466
¶ 4.)

94.     Prater further testified at trial that he eventually went to sleep and when he woke up
in the late morning of January 28, 1982, Motley still had the .357 magnum and Morgan had a
shotgun. (TR 762-64.) Prater stated that Motley was sitting on a love seat and making calls on the
telephone while looking through a black address book. (TR 763-64, 766.) Morgan and Motley
then exchanged words over Morgan's request that Gregson take off her shirt and dance. (766-68.)
At that point, claimed Prater, Morgan shot Motley in the chest with the shotgun. (TR 766-68,
1011-12.) The subsequent police investigation, however, found no blood or shotgun pellets on the
love seat, or on the floor or white walls near the love seat. (STR 236-37, 247-48; SC 2288; SC
2290.)

95.    At trial, Prater asserted that Morgan ordered the others to clean up the apartment and wrap the body. (TR 767.) Morgan then told Prater to get gas in the car, buy some liquor, and bring the car around the back door of the apartment. (TR 767, 773-74.) Prater did so and returned to the apartment. (TR 773-74.) At that point, according to Prater's now-recanted testimony, Morgan and Merkson started arguing after Merkson had been joking around. (TR 777-79.) Morgan then made Merkson get down on his knees and shot Merkson with the .357 magnum. (TR 779-80.) Shortly afterward, as Prater was wrapping up Merkson's body, Morgan took a shot at Prater, and Prater ran out the back door of the apartment. (TR 780-83.)

96.    The physical evidence at trial was limited to one fingerprint belonging to Morgan that was found on a dresser drawer in Prater's apartment (TR 626, 642), a .357 magnum in Morgan's possession when he was arrested (TR 563; C 1647), and which fired the bullet found in the floor under Merkson's body, and a black address book found in Morgan's possession when he was arrested. (TR 575; C 1646.) While this evidence is arguably consistent with both Prater's trial testimony and post-conviction testimony recanting the trial testimony, glaring is the omission in Prater's original testimony of any reference to the owner of the black address book and the .357 magnum – that is, to Lemuel Bell. Bell did not attend Morgan's trial. (SC 903 ¶ 10; STR 356.) Bell's name does not appear on any documents that the State produced to Morgan in discovery. (C1682-86.) Bell's handwriting, which appears on a number of the pages in the address book (SC 902 ¶ 7; STR 361) is never identified. In the coerced testimony Prater offered at trial, he completely left Bell out of the story although, as we now know from Bell's post-conviction affidavit, Bell was at Prater's apartment on the night of January 27, 1982. (SC 902 ¶ 8.)

97.    The State also allowed Prater to testify at trial that he had not been promised anything in exchange for his testimony. (TR 794-95.) The truth, as noted above, was that the

police told Prater that in exchange for his testimony, they would not charge him with murder, or put him in Morgan's cell. (STR 254-55.)

98.     The State's only other eyewitness, Phyllis Gregson, gave testimony similar to Prater's, claiming in addition that when shot in the chest by Morgan from a distance of six or seven feet, Motley "flew off the love seat onto the floor." (TR 1013.) Again, the pictures of the crime scene show no signs of blood on or around the love seat. Gregson further testified that after Prater ran out the back door, Morgan abducted Gregson at gun point and drove her to a motel on the south side of Chicago. (TR 1034-36.) Once there, she testified, Morgan forced intercourse upon Gregson without her consent. (TR 1036-41.) According to Gregson, she then left the motel with Morgan in the same car, and soon afterwards, he forced her out of the car and drove off. (TR 1042-43, 1046.) The credibility of these statements, however, could not be tested against the lenient treatment she received on her two arrests as the State never produced those records. (C 1685 ¶ 9; SC 989-96.)

99.     In closing argument, the State capitalized on the handicap it had imposed on Morgan's defense, specifically vouching for the State's complete candor in contrast to Morgan's inferior cross examination of Prater and Gregson. In particular, the prosecutor argued to the jury:

> That is our job. We presented the evidence. We don't go out and create the evidence. We don't go out and make the evidence. We present the evidence that there is. Whatever evidence is there, that is exactly what we bring to you. And there is no question but through the course of this trial there is no doubt that [the prosecution has] done everything to bring everything in front of you. *We brought you all of the witnesses . . . every piece of evidence that we could bring to you for your consideration.* We brought it to you as it was, not as we created it, but as we found it; and that is what we found.

(TR 1455.)

* * *

> Again, I repeat to you, and [the State] make[s] no bones about it, *we didn't hide anything from you about Eliga [sic] Prater and Phyllis Gregson.*

- 31 -

(TR 1468-69.)

* * *

> ...we will let [Morgan] have a jury and we will let him cross-examine the witnesses against him, ... what is known as his constitutional rights. He has had all of that. He has had a fair trial. *He has had his opportunity to confront the witnesses against him* and to bring his evidence forward.

(TR 1473.)

100. The coerced testimony and withheld impeachment material, however, assured that the jury would not have the facts to address the ultimate question the prosecutor then posed, namely, were Phyllis Gregson and Elijah Prater, whose eye-witness testimony represented "the biggest part of the case," "making it up?" (TR 1403.) But for the State's improper conduct, the answer would have been a resounding "yes."

## Morgan Exhausts His State Remedies

101. Morgan has exhausted all available state remedies regarding the claims in this Petition for Writ of Habeas Corpus.

102. The failures by trial counsel, including his absences from critical stages of trial, before and during the guilt phase, as outlined above, were raised and argued by Morgan to the Circuit Court of Cook County in his post-conviction petition and to the Illinois Supreme Court in his subsequent appeal of the denial of that petition. Morgan has therefore exhausted all available appeals on these matters.

103. In his Successor Petition and Amended Successor Petition, Morgan presented the above-outlined evidence of the State's misconduct and its violation of its constitutional obligation to disclose exculpatory and impeachment material to Morgan at the time of his trial to the Circuit Court of Cook County. The circuit court refused to allow testimony concerning Gregson's arrests and favorable treatment by the State at the evidentiary hearing concerning the successor post-conviction petition.

- 32 -

104.    Morgan then appealed the circuit court's denial of relief to Morgan to the Illinois Supreme Court, which rejected Morgan's claims, ruling that the new evidence set forth in Prater's recantation and as corroborated by other witnesses and evidence of the State's failure to disclose exculpatory evidence regarding Gregson, along with the physical evidence, did not provide a sufficient basis for finding that Morgan had been deprived of his constitutional rights at trial. *People v. Morgan*, 817 N.E.2d 524, 532-33 (Ill. 2004). In so doing, the Illinois high court perfunctorily rejected Morgan's meritorious *Brady* claim and refused to redress what even it conceded was "problematic" evidence that the State should have disclosed to the defense before trial in 1983. *Id.* The Illinois Supreme Court upheld Morgan's two murder convictions, and convictions for aggravated kidnapping and rape, and remanded the case to the Circuit Court of Cook County to conduct a new sentencing hearing. *Id.* at 533. On December 22, 2004, Morgan filed a petition for a writ of certiorari from the United States Supreme Court, which was denied. *Morgan v. Illinois*, 543 U.S. 1167 (2005).

105.    To the extent that the factual basis for any claim or portion thereof presented in this petition is deemed not to have been developed in state court proceedings, any such failure cannot be attributed to something that Morgan did or omitted to do. Rather, to the extent that the factual basis for any claim or portion thereof is deemed not to have been developed in state court proceedings, Morgan is not at fault because his diligence was thwarted by the misconduct of the State, and also, in the case of the evidence concerning the State's failure to disclose evidence concerning Gregson's arrests and the dispositions of those charges, by the state courts' refusal to allow him to present that evidence at a post-conviction evidentiary hearing.

## COUNT I – 28 U.S.C. § 2254(d)(1)-(2) –
## KNOWING USE OF FALSE TESTIMONY AND
## FALSE REPRESENTATIONS BY STATE –
## VIOLATIONS OF DUE PROCESS (U.S. CONST. AMEND. XIV)

106.    Morgan incorporates paragraphs 1 through 105 above as if fully set forth in this Count I.

107.    The State knowingly used false testimony at Morgan's trial to obtain his convictions by using the false and coerced testimony of Elijah Prater and Phyllis Gregson.

108.    The State knowingly used false testimony to obtain Morgan's convictions and made false representations to Morgan's trial counsel and to the jury concerning Phyllis Gregson and matters concerning her credibility, in violation of Morgan's due process rights under the Fourteenth Amendment to the United States Constitution.

109.    Despite a specific discovery request from Morgan's trial counsel for information relating to the arrests and convictions of any State witnesses, the State never produced such records for Phyllis Gregson, and expressly and falsely denied that any of its witnesses, including Gregson, had been arrested or convicted.

110.    At closing argument for the guilt/innocence phase of trial, the State falsely represented to the jury that it had not hidden anything from the jurors concerning Prater or Gregson.

111.    In fact, between the time of Morgan's indictment on the charges of murdering Merkson and Motley and the rape and aggravated kidnapping of Gregson, the State arrested Gregson twice, and agreed to give her favorable treatment on the charges against her related to both arrests.  Moreover, the State had promised Prater they would not carry out their threats if he testified as its agents demanded (STR 254-55), while Prater testified he had not been promised anything for his testimony.  (TR 794-95.)

112.    Morgan's claim for knowing use of perjured testimony and misrepresentations by the State to defense counsel and the jury were and are not procedurally barred before Morgan's Successor Post-Conviction Petition and appeal from the denial thereof because Morgan was unable to present this evidence previously to the state courts because of the State's misconduct.

113.    The Illinois courts' refusal to grant Morgan relief by vacating his convictions was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.

114.    The Illinois courts' refusal to grant Morgan relief by vacating his convictions resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

### COUNT II – 28 U.S.C. § 2254(d)(1)-(2) – SUPPRESSION OF MATERIAL EVIDENCE FAVORABLE TO THE ACCUSED – VIOLATIONS OF DUE PROCESS (U.S. CONST. AMEND. XIV)

115.    Morgan incorporates paragraphs 1 through 105 above as if fully set forth in this Count II.

**(a)    Gregson's Criminal History and Favorable Treatment by the State**

116.    The State failed to disclose the criminal history of Phyllis Gregson and failed to disclose that Gregson cut a deal with the State in return for her testimony against Morgan, in violation of Morgan's due process rights under the Fourteenth Amendment to the United States Constitution.

117.    Despite a specific discovery request from Morgan's trial counsel for information relating to the arrests and convictions of any State witnesses, the State never produced such records for Gregson, and expressly and falsely denied that Gregson had been arrested or convicted.

118.    In fact, between the time of Morgan's indictment on the charges of murdering

Merkson and Motley and the rape and aggravated kidnapping of Gregson, the State arrested

Gregson twice, and agreed to give her favorable treatment on the charges against her related to

both arrests.

119.    Gregson's criminal record and the favorable treatment Gregson received from the

State are facts favorable to Morgan as both facts could have been used during the guilt/innocence

phase of trial to impeach Gregson.

120.    Gregson's credibility as a witness and motive to testify against Morgan are material

facts because Gregson was one of only two eyewitnesses to testify against Morgan and this

evidence could have reasonably put the whole case in a different light since one of the

eyewitnesses' credibility would have been damaged, and creates a reasonable probability that the

outcome of Morgan's trial would have been different.

**(b)    Prater's Coerced Testimony**

121.    The State failed to disclose that the testimony of Elijah Prater used to obtain

Morgan's convictions was coerced, in violation of Morgan's due process rights under the

Fourteenth Amendment to the United States Constitution.

122.    The State failed to disclose that it used false testimony at Morgan's trial to obtain

his convictions by using the false and coerced testimony of Elijah Prater.

123.    At the evidentiary hearing held in September and October 2001, Prater recanted his

trial testimony and detailed how the police coerced him into giving testimony against Morgan by

using threats and physical humiliation, saying that Gregson would call him a liar, threatening to

charge him along with Morgan for the murders, and threatening to put Prater in the same cell as

Morgan.

124.    That Prater's testimony was coerced is a fact favorable to Morgan as it could have been used during the guilt/innocence phase of trial to impeach Prater's testimony.

125.    Prater's credibility as a witness and motive to testify against Morgan are material facts because Prater was one of only two eyewitnesses to testify against Morgan and this evidence could have reasonably put the whole case in a different light since one of the eyewitnesses' creditability would have been damaged, and creates a reasonable probability that the outcome of Morgan's trial would have been different.

(c)    **Prater's Exculpatory Statements**

126.    The State failed to disclose that Prater had made exculpatory statements regarding Morgan, in violation of Morgan's due process rights under the Fourteenth Amendment to the United States Constitution.

127.    The State failed to disclose that Prater had made exculpatory statements during his interrogation by police on January 30, 1982.

128.    In particular, Prater had told police and the state's attorneys that Morgan had forced himself to stay awake on the night and morning of January 27 and 28, 1982 because he believed that Motley and Merkson were going to kill him and that Morgan had stayed awake the night of January 27 by repeatedly talking to his girlfriend, Rosemary Thomas, on the telephone.

129.    Prater's statements regarding Morgan staying awake for fear Motley and Merkson were going to kill him are material exculpatory facts favorable to Morgan since they corroborate the statements of Rosemary Thomas and support Morgan's defenses of self-defense and defense of others as to the homicide of Motley.

130.    This evidence could have reasonably put the whole case in a different light by presenting another defense theory, and creates a reasonable probability that the outcome of Morgan's trial would have been different.

**(d)    Gregson's Exculpatory Statements**

131.    The State failed to disclose that Gregson had made exculpatory statements regarding Morgan, in violation of Morgan's due process rights under the Fourteenth Amendment to the United States Constitution.

132.    The State failed to disclose that Gregson had made exculpatory statements during her police interview on January 30, 1982.

133.    In particular, Gregson had stated that Morgan was always a gentleman and never said anything rude or sexual to her; that she was afraid of Motley and Merkson; and that Prater was selling drugs out of his apartment.

134.    Gregson's statements, that Morgan was a gentleman, that Morgan never said anything sexual, that she was also afraid of Motley and Merkson, and that Prater sold drugs are material exculpatory facts favorable to Morgan since they support Morgan's defenses of self-defense and defense of others, discredit the charges against Morgan for aggravated kidnapping and rape, and impeach the credibility of Prater's testimony.

**(e)    Materiality of the Undisclosed Evidence**

135.    The State's failure to disclose exculpatory evidence in its possession prejudiced the defense and deprived Morgan of his rights to present a defense and to due process and a fair trial in violation of the Fourteenth Amendment.

136.    As evidenced above, the State used Prater's and Gregson's perjured trial testimony to convict Morgan.  In addition, Gregson clearly had a motive to lie in exchange for favorable treatment from the State on her own felony charges.

137.    There is a reasonable probability that but for the State's prejudicial non-disclosure of exculpatory and impeachment evidence, the outcome of Morgan's trial would have been different.  By refusing to grant Morgan relief, or even a hearing as to the Gregson evidence, on the State's failure to disclose exculpatory evidence, the Illinois Supreme Court misinterpreted the United States Supreme Court decision in *Brady v. Maryland*, 373 U.S. 83 (1963), and its many progeny opinions of the Supreme Court.

138.    Morgan's claim for suppression of material evidence favorable to the accused is not procedurally barred because Morgan presented this evidence previously to the state courts in his Second Amended Petition for Post-Conviction Relief, his Successor Petition, and Amended Successor Petition.

139.    The Illinois courts' refusal to grant Morgan relief by vacating his convictions was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

140.    The Illinois courts' refusal to grant Morgan relief by vacating his convictions resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

### COUNT III – 28 U.S.C. § 2254(d)(2) – FAILURE TO CONSIDER RECANTED TESTIMONY – VIOLATIONS OF DUE PROCESS (U.S. CONST. AMEND. XIV)

141.    Morgan incorporates paragraphs 1 through 105 above as if fully set forth in this Count III.

142.    The circuit court wrongfully denied Morgan's claims of actual innocence under his

Successor Petition on October 29, 2001.  The circuit court failed to accord due weight to Prater's

recanted testimony, in light of its consistency with the physical evidence and its corroboration by

other witnesses, in violation of Morgan's due process rights under the Fourteenth Amendment to

the United States Constitution.

**(a)    Prater's recantation and the physical evidence**

143.    At the evidentiary hearing held in September and October 2001, Prater detailed the

actual events of the morning of January 28, 1982.  This recantation was consistent with the

physical evidence, unlike the coerced testimony Prater provided at trial.  In particular, the blood

evidence is consistent with Prater' recantation and contrary to the trial testimony that Motley was

shot while seated on a love seat in the living room, since the police found no blood or shotgun

pellets on the love seat, or on the floor or on the white walls near the love seat.  Other witness

testimony at the 2001 evidentiary hearing, *i.e.*, that of Ruwe, Bell, Thomas and DeMarco,

corroborated Prater's recantation.

144.    The circuit court unreasonably denied Morgan relief despite Prater's testimony

under oath at the evidentiary hearing.  Not only are the facts Prater swore to in his recantation

consistent with the physical evidence, but those facts are more consistent with the physical

evidence than the fabricated story Prater told at trial in 1982.  (STR 236-37; STR 247-48; SC

2288; SC 2290.)

**(b)    Prater's coerced trial testimony**

145.    At the evidentiary hearing held in September and October 2001, Prater recanted his

trial testimony and detailed how the police coerced him into giving testimony against Morgan by

- 40 -

using physical humiliation, saying that Gregson would call him a liar, threatening to charge him along with Morgan for the murders, and threatening to put Prater in the same cell as Morgan.

146.    In addition, Prater's testimony concerning the homicides in his apartment and his coercion at the hands of the police was corroborated by other witnesses, including Lemuel Bell, Rosemary Thomas, Cynthia Ruwe, and Frank DeMarco.

147.    The Illinois courts unreasonably determined that Morgan was not entitled to relief despite Prater's testimony under oath at the evidentiary hearing.  Prater clearly detailed that his trial testimony was coerced and then provided testimony concerning the actual events of January 28, 1982.  Prater's trial testimony, as one of only two eyewitnesses, was critical to obtaining Morgan's conviction.  On the other hand, Prater's recantation establishes that Morgan committed only one homicide, not two, and in that instance acted in self-defense and defense of others.

148.    Morgan's claim for failure to consider Prater's recanted testimony is not procedurally barred because Morgan presented this evidence previously to the state courts in his Successor Petition, the evidentiary hearing thereon, and the subsequent appeal of the Circuit Court's denial of that Petition.

149.    The Illinois courts' refusal to grant Morgan relief by vacating his convictions resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

**COUNT IV – 28 U.S.C. § 2254(d)(1)-(2) –
DENIAL OF COUNSEL OF CHOICE –
VIOLATIONS OF RIGHT TO COUNSEL (U.S. CONST. AMENDS. VI AND XIV)**

150.    Morgan incorporates paragraphs 1 through 105 above as if fully set forth in this Count IV.

151.    The Illinois courts failed to provide Morgan his counsel of choice during his trial, in violation of Morgan's right to counsel under the Sixth Amendment and his right to due process under the Fourteenth Amendment to the United States Constitution.

152.    Lawrence Wolf Levin was Morgan's retained lawyer and counsel of choice as Levin was paid $10,000 by Morgan's mother to represent Morgan. Levin filed an appearance as trial counsel on behalf of Morgan.

153.    Levin was frequently absent from trial, including from part of voir dire, arguments on the admissibility of certain evidence, opening statements, the first four witnesses in the State's case-in-chief, and during the examination of three additional witnesses in the State's case.

154.    In addition to Levin's frequent absences, Levin also sought numerous extensions and was admonished for being unprepared by the trial judge on more than one occasion.

155.    In Levin's absence, the Court forced Steven Decker to act as Morgan's counsel at his capital murder trial. Morgan did not retain Decker. Decker essentially functioned as an unprepared stand-in during Levin's absences.

156.    Morgan had a right to the retained counsel of his choice. Morgan chose Levin as his counsel. Levin, however, was frequently absent from critical stages of the trial. Decker was not Morgan's counsel of choice. Decker's status as an attorney and his presence at the trial does not satisfy the constitutional requirement that Morgan be given his counsel of choice. The trial judge forced Morgan's case to trial even though Morgan's counsel of choice was not present.

157.    The Sixth Amendment guarantees a defendant a retained counsel of his choice, not just any counsel. Because Morgan was denied his counsel of choice, he does not need to demonstrate that he was prejudiced or that Decker's presence as counsel at trial did not constitute

harmless error.  Even so, the Court's action in forcing Decker on Morgan did prejudice Morgan as Decker was not prepared to take on Morgan's defense.

158.     Morgan's claim for denial of counsel of choice is not procedurally barred because Morgan presented this evidence previously to the state courts in his post-conviction petition and to the Illinois Supreme Court on subsequent appeal to the denial of that petition.

159.     The Illinois courts' refusal to grant Morgan relief by vacating his convictions was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

160.     The Illinois courts' refusal to grant Morgan relief by vacating his convictions resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

### COUNT V – 28 U.S.C. § 2254(d)(1)-(2) – DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL (U.S. CONST. AMEND. VI)

161.     Morgan incorporates paragraphs 1 through 105 above as if fully set forth in this Count V.

**(a)     Levin's failure to investigate or present evidence of Morgan's seizures**

162.     Levin provided ineffective assistance of counsel that caused a severe breakdown in the adversarial process.

163.     Levin was aware of Morgan's history of seizures yet failed to further investigate or present evidence of Morgan's condition at trial.

164.     Levin was specifically told about Morgan's seizures by Morgan's mother, Josephine Rogers.  Yet, Levin never inquired further into Morgan's health or background.  In particular, Morgan's mother stated that she thought Morgan might have suffered a seizure when Motley and Merkson were killed.  Despite this knowledge, Levin did not adequately interview

Rosemary Thomas, Morgan's girlfriend, who had lived with Morgan for several years prior to his arrest in 1982 and whom later testified that Morgan had called her from Prater's house several hours prior to the homicides saying that "devils and demons" were after him.

165.    Levin's performance was deficient as he failed to interview the two individuals closest to Morgan who would have been able to testify about his physical and mental condition; Morgan's mother and his girlfriend Thomas.

166.    Morgan was prejudiced by Levin's deficient performance because his history of seizures and the subsequent changes to his personality were relevant to his mental state. Furthermore, Thomas's testimony would have provided Morgan's defense with the benefit of corroborating Prater's recantation based on Morgan's calls to Thomas about Morgan's fear of Motley and Merkson.

(b)    **Levin's failure to interview the only two eyewitnesses to Morgan's behavior**

167.    Despite the fact that Gregson and Prater were the only two people to have an opportunity to observe Morgan before, during, and after the homicides of Motley and Merkson, Levin never interviewed Gregson before or during the trial nor did he attempt to interview Prater before the trial.

168.    If Levin would have interviewed Prater, he may have discovered the evidence regarding the true facts of the homicides. Due to Levin's deficient investigation of the two key eyewitnesses, Morgan was prejudiced by Levin's inability to present a defense for Morgan that: (1) he did not kill Merkson; (2) he killed Motley in self-defense and defense of others; and (3) he lacked the requisite mental state to commit murder. Instead, Levin went through an ineffective and irrelevant cross-examination of Prater and Gregson where he tried to get Prater and Gregson to admit they, in fact, were responsible for the murders.

- 44 -

    (c)    **Levin's failure to request unrecorded exculpatory witness statements**

169.    Levin failed to make a discovery request for unrecorded exculpatory witness statements taken by the State. Such discovery requests are basic and common requests that are fundamental to the adequate preparation of a criminal defense.

170.    If Levin would have requested such unrecorded exculpatory witness statements, Levin would have, absent further State misconduct, discovered the statements made by Prater describing the drastic changes in Morgan's behavior and Gregson's statement that Morgan was afraid of Motley and Merkson.

171.    Levin's inadequate discovery requests prejudiced Morgan because these unrecorded exculpatory statements would have supported the above defenses.

    (d)    **Levin failed to investigate and present evidence discrediting the two eyewitnesses**

172.    Levin failed to investigate the background of Prater and Gregson. In particular, both were involved in either the sale or distribution of illegal drugs. In fact, Levin even referred to Prater and Gregson as "junkies" when speaking with Morgan's mother and sister.

173.    In particular, Levin failed to elicit from Morgan's girlfriend, Rosemary Thomas, her knowledge about Prater's drug dealing. Thomas's testimony would have provided Morgan's defense with the benefit of providing information that could have been used to impeach Gregson and Prater at the trial. Levin's failure to investigate Gregson and Prater was deficient since the only defense Levin ushered forth at trial was that Gregson and Prater, and not Morgan, committed the homicides.

174.    Morgan was prejudiced because the only defense his trial counsel presented was not fully investigated or developed since Levin did not interview relevant individuals that could have

- 45 -

discredited Prater and Gregson or who would have provided information into their criminal activities and involvement with the selling and distribution of illegal drugs.

### (e)    Decker was unprepared and Levin was absent from critical portions of trial

175.    When Levin was absent from portions of trial, Decker stood in as counsel. Decker was clearly unprepared to handle the trial and often requested extensions to allow Levin an opportunity to return and proceed with the trial. Decker's representation of Morgan was deficient due to Decker's failure to adequately communicate with Morgan and to prepare for the trial.

### (f)    Prejudice is presumed, and Morgan was in fact prejudiced by the deficient performance of Levin and Decker

176.    As Levin was Morgan's retained counsel of choice, Levin's absence from trial required that the Illinois courts presume that Morgan was prejudiced even when Levin's stand-in Decker was present and was ordered by the circuit court judge to proceed with Morgan's trial.

177.    Prejudice is presumed in light of Levin's absences during critical phases of trial.

178.    Even if prejudice is not presumed, Morgan was in fact prejudiced by the piecemeal performance of Levin and Decker at trial. Levin's frequent absences from critical portions of trial and failure to investigate and prepare prejudiced Morgan's defense since it left Morgan's life in Decker's hands. Decker's handling of Morgan's trial was deficient. Decker was an inexperienced attorney handling this capital murder case. Decker did not discuss strategy or otherwise meet with Morgan; Morgan's mother, Josephine Rogers; or Morgan's sister, Ruby Roberts. Decker was not prepared to give an opening statement or to cross-examine the State's witnesses as he was not expecting to be handling these portions of the case. This fact is demonstrated by Decker's surprise at Levin's absences and his continued requests for extensions of time so that Levin could return and conduct the defense of Morgan.

179.    Even when Levin was present at trial, his performance was also deficient.  Levin did not interview Prater, Gregson, Rogers or Roberts; he did not seek additional discovery; and he failed to perform his own independent investigation.  Due to these deficiencies, Levin did not know the real facts of the case or of Morgan's mental impairment.  Because he did not have the true facts at his disposal, Levin was unable to effectively cross-examine the only two eyewitnesses, Prater and Gregson.  Instead, Levin floundered as he tried to establish that Prater and Gregson were the perpetrators of the murders of Motley and Merkson.

180.    Morgan was prejudiced by Levin's absences, Levin's lack of effort to learn the real facts surrounding the death of Motley and Merkson, Decker's lack of experience, Decker's lack of preparation, and Decker's lack of substantive involvement prior to trial as the State essentially proceeded unchallenged throughout Morgan's trial.

181.    Morgan's claim for ineffective assistance of counsel is not procedurally barred because Morgan presented this evidence previously to the state courts in his proceedings before the Circuit Court of Cook County and in his post-conviction petition and to the Illinois Supreme Court on subsequent appeal to the denial of that petition.

182.    The Illinois courts' refusal to grant Morgan relief by vacating his convictions was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

183.    The Illinois courts' refusal to grant Morgan relief by vacating his convictions resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

WHEREFORE, for all of the reasons set forth above, Petitioner Samuel Morgan respectfully requests that this Court find that his convictions are unconstitutional and issue a writ

of habeas corpus requiring that the State of Illinois provide him a new trial forthwith, consistent

with his rights under the United States Constitution, or else release him, and that it grant him such

other relief as is just and appropriate in the circumstances.

Respectfully submitted,

SAMUEL MORGAN

By:    /s/ Matthew J. O'Hara
                  One of His Attorneys

James A. Rolfes (Bar No. 6200271)
Matthew J. O'Hara (Bar No. 6237795)
Marina C. Santini (Bar No. 6290668)
Grant Y. Lee (Bar No. 6290026)
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606
(312) 207-1000

Thomas F. Geraghty (Bar No. 0937436)
J. Samuel Tenenbaum (Bar No. 2808315)
BLUHM LEGAL CLINIC
NORTHWESTERN UNIVERSITY SCHOOL OF LAW
357 East Chicago Avenue
Chicago, IL 60611
(312) 503-3100

## CERTIFICATION PURSUANT TO 28 U.S.C. § 2242

Samuel Morgan declares under penalty of perjury that he has read the foregoing Petition for Habeas Corpus and that the facts stated therein are true and correct.

Samuel Morgan
No. A81754
Route 53
P.O. Box 112
Joliet, Il 60434