**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SAMUEL MORGAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No.  08 C 3378** |
| **v.** | ) | |
| **ANTHONY RAMOS, in his official capacity** | ) | **JUDGE DAVID H. COAR** |
| **as Warden, Stateville Correctional Center,** | | |
| **Illinois Department of Corrections,**[1] | | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Samuel Morgan is currently serving a life sentence of imprisonment at Stateville

Correctional Center due to his convictions for the murder of William Motley and Kenneth

Merkson and the rape and aggravated kidnapping of Phyllis Gregson.  Presently before this

Court are Morgan's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, his motion

for an evidentiary hearing on the facts underlying his constitutional claims, and Morgan's motion

to strike portions of the State's response to his amendment to his habeas petition.  For the reasons

stated below, Morgan's motion to strike is denied.  In addition, the Court respectfully denies

Morgan's habeas petition without an evidentiary hearing.


**BACKGROUND**

The Court takes the following factual account from the opinions of the Illinois Supreme

Court in Morgan's direct appeal, *People v. Morgan*, 492 N.E.2d 1303 (Ill. 1986) (*Morgan I*),

---

[1] Warden Anthony Ramos is substituted in place of the named respondent, Terry McCann, because Morgan is
currently in the custody of Ramos.  *See* Rule 2(a) of the Rules Governing Section 2254 Cases; Fed. R. Civ. P.
25(d)(1); *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (citing *Hogan v. Hanks*, 97 F.3d 189, 190 (7th Cir. 1996));
*Bridges v. Chambers*, 425 F.3d 1048, 1049-50 (7th Cir. 2005).

*cert. denied,* 479 U.S. 1101 (1987), and post-conviction proceedings, *People v. Morgan*, 719 N.E.2d 681 (Ill. 1999) (*Morgan II*) and *People v. Morgan*, 817 N.E.2d 524 (Ill. 2004) (*Morgan III*), unless otherwise indicated. For the purposes of habeas review, the Court presumes the state court's factual findings to be correct unless Morgan rebuts this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

## I.    Factual Background

On the afternoon of January 27, 1982, Morgan arrived at the apartment of his longtime friend, Elijah Prater ("Prater"), accompanied by William Motley ("Motley") and Kenneth Merkson ("Merkson"). After the four men talked and used cocaine and marijuana for approximately 15 to 20 minutes, the group dispersed. Prater, Merkson, and Motley left the apartment, and Morgan stayed behind.

Phyllis Gregson ("Gregson"), who knew both Prater and Morgan, arrived at Prater's apartment around 8:30 that evening. Morgan was still at the apartment alone when Gregson arrived, and he invited her inside. The two shared marijuana and watched television. At 9:00 p.m., two men who were unfamiliar to Gregson arrived at the apartment, talked with Morgan until around midnight, and then left. Gregson and Morgan were alone again in the apartment, and at this point, Morgan made sexual advances toward Gregson, which she refused.

At approximately 1:00 a.m. on January 28, 1982, Prater, Merskon, and Motley returned to the apartment. The three men, along with Morgan and Gregson, proceeded to consume cocaine and marijuana while they spent the night at Prater's apartment.

Around 3:00 a.m., Prater and Gregson were talking quietly on the couch in the front room of the apartment, when Morgan called them into the bedroom and demanded to know what they were discussing. After Prater responded, Morgan directed Merkson to retrieve a shotgun from

the bedroom closet and hand it to him.  Morgan pointed the shotgun at Prater and Gregson and again demanded to know the truth about what they were discussing.  At this point, Gregson told Morgan that she wanted to go home.  Morgan grabbed her, punched her in the face, and knocked her to the floor by hitting her in the chest with the butt of the shotgun.  Merkson helped Gregson back to her feet, and eventually, Gregson went into the front room of the apartment where she fell asleep on the couch.  The four men stayed awake and continued using cocaine until about 5:00 a.m.

Just before noon on January 28, 1982, Motley was sitting on a loveseat in the front room of the apartment, talking on the telephone and looking through a small, black telephone book. While he was making calls, Motley had a .357 magnum revolver tucked under his leg.  Gregson and Morgan were also sitting in the front room of the apartment; Gregson was sitting on a rocking chair, while Morgan sat with a shotgun across his lap, some six to seven feet from Motley.  Prater and Merkson were both in the kitchen.

At this point, Morgan instructed Gregson to remove her shirt and dance for him, and Gregson refused.  Motley, who was still sitting on the loveseat, made an unknown comment to Morgan, and Morgan fired his shotgun at Motley, hitting him in the left side of his chest. Motley's body flew off of the loveseat onto the floor.  Morgan then grabbed the revolver from Motley's body and placed it in his own waistband.

Morgan stepped into the kitchen and directed Prater and Merkson to come into the front room and clean up Motley's body.  While doing so, Merkson removed some money, marijuana, and the black telephone book from Motley's body and gave them to Morgan.  After unsuccessfully trying to fit Motley's body into a dresser drawer, Prater and Merkson stuffed his

body into a laundry bag and wrapped it inside a mattress. Morgan instructed Gregson to clean Motley's blood from the floor, and she complied.

Shortly thereafter, Morgan sent Prater to buy alcohol and to fill his car with gasoline. When Prater returned approximately 15 minutes later, Gregson was washing dishes in the kitchen, and Morgan was sitting in the dining room with the shotgun in his lap and the revolver tucked into his waistband. Merskon was walking around the apartment making jokes. The men drank some of the liquor that Prater had purchased, and Merkson continued to make jokes until Morgan told him to stop and to remove Motley's body from the apartment. When Merkson made another remark, Morgan chased him into the front room of the apartment, where he hit him in the head with the butt of the revolver. Morgan again directed Merkson and Prater to remove Motley's body from the apartment. Merkson made another comment to Morgan, and, at this point, Morgan ordered Merkson to get down on his knees and face the floor. Prater testified at trial that he saw Morgan aim his revolver at Merkson's head from a distance of four to five feet. Prater then turned to face the wall, heard a shot, and turned back to find Merkson's body on the floor. Both Gregson and Prater testified that they saw Morgan standing beside Merkson's fatally wounded body with the revolver in his hand.

Morgan then ordered Gregson to clean up Merkson's blood and instructed Prater to remove the body from the apartment. As Prater began tying up Merkson's body, Morgan approached from behind him and began shooting. Prater felt a bullet pass by his head, and he ran out of the apartment. At this point, Morgan ordered Gregson to go into the bathroom, where she locked the door behind her. After five or ten minutes, Morgan ordered her to come out. Still armed with the revolver, Morgan took Gregson out of the apartment by her arm. While this was happening, Prater's downstairs neighbor called the police in response to the shots he had heard.

Upon arriving on the scene, police officers discovered the bodies of Motley and Merkson, a loaded shotgun, a fingerprint on the dresser later identified as Morgan's, a bullet from the floor, and a bullet from the downstairs neighbor's apartment.

Meanwhile, after leaving Prater's apartment, Morgan took Gregson to the South Shore Motel, where he checked in under an alias and raped her. After spending about two hours in the motel room, Morgan escorted Gregson by the arm to his car. A motel employee testified that he witnessed Morgan pointing his revolver at Gregson's head. Upon noticing the employee, Morgan aimed the gun at him and began to chase him. When the employee ran toward the motel lobby, Morgan chased him for a short distance, then returned, again grabbed Gregson by the arm, and led her to his car. The motel employee testified that he saw Morgan push Gregson into his car headfirst. Shortly after driving away from the motel, Morgan stopped the car and told Gregson to get out on the side of the road. He threatened Gregson, warning her not to tell anyone about what had happened, or he would come and find her. Morgan then drove off at a high rate of speed.

Morgan was arrested the following day. While investigating an unrelated disturbance, Chicago police officers encountered Morgan and called to him to stop. Instead of stopping, Morgan continued walking. The officers then identified themselves as police officers, at which point Morgan dropped a plastic bag to the ground and continued walking. The officers pursued Morgan on foot, and when they were within approximately 15 to 20 feet of him, Morgan turned toward the officers and pulled a revolver from his coat pocket. When he saw the officers' guns, he dropped his weapon. The officers took Morgan into custody and recovered the revolver, the plastic bag, and its contents. Later that same day, Prater informed the police that Morgan was

responsible for the deaths of Motley and Merkson.  Gregson, when contacted by the police, offered an account consistent with Prater's.

At trial, expert testimony showed that the revolver recovered from Morgan upon his arrest had fired the bullets police found at the crime scene.  The plastic bag that Morgan dropped prior to his arrest contained a black notebook, which Prater and Gregson identified as the book Merskon had removed from Motley's body.  Prater and Gregson testified as the only eyewitnesses against Morgan at trial.  (Pet. at ¶ 16.)

## II.     Procedural Background

### a.  Morgan's Trial

On May 3, 1983, a jury convicted Morgan of the murder of Merkson and Motley and the rape and aggravated kidnapping of Gregson.  *Morgan I*, 492 N.E.2d at 1305.  After Morgan waived his right to a jury at the capital sentencing hearing, the court sentenced Morgan to death for the murders of Merkson and Motley.  *Id.* at 1309.  In addition, the court imposed concurrent extended prison terms of 60 years for the rape of Gregson and 30 years for her aggravated kidnapping.  *Id.*

### b.  Direct Appeal

Morgan appealed his conviction and sentence directly to the Illinois Supreme Court.  In his direct appeal, Morgan raised claims of prosecutorial misconduct, error in the trial court's qualification of prospective jurors and its consideration of irrelevant evidence, involuntary waiver of jury sentencing, and the unconstitutionality of the death penalty statute.  On April 18, 1986, the Illinois Supreme Court affirmed Morgan's convictions and sentence of death, vacated the extended terms of imprisonment imposed for rape and kidnapping charges, and reduced the rape sentence to 30 years and the kidnapping sentence to 15 years.  *Morgan I*, 492 N.E.2d at

1306.  Morgan then filed a petition for a writ of certiorari in the United States Supreme Court,

which was denied on February 23, 1987.  *Morgan v. Illinois*, 479 U.S. 1101 (1987).  The United

States Supreme Court also denied Morgan's petition for rehearing.  *Morgan v. Illinois*, 481 U.S.

1025 (1987).

### c.  Post-Conviction Petition

On January 20, 1988, Morgan filed a petition for post-conviction relief under 725

ILCS 5/122-1, *et seq.*, challenging his convictions and death sentence.  With the court's

permission, Morgan amended that petition on July 28, 1993, and again on July 3, 1995.  (Pet. at ¶

22.)  Morgan's second amended petition included 14 claims.  The circuit court dismissed all of

the claims without an evidentiary hearing, with the exception of a portion of Morgan's

ineffective assistance of counsel claim.  *Morgan II*, 719 N.E.2d at 686.  The court granted an

evidentiary hearing on Morgan's claim that his trial counsel's failure to investigate and present

mitigating evidence of Morgan's brain damage and medical condition denied Morgan effective

assistance of counsel at his sentencing.  (Pet. at ¶ 23.)  The court ultimately denied relief on that

claim as well.  *Morgan II*, 719 N.E.2d at 686.

Morgan appealed the circuit court's decision to the Illinois Supreme Court.  On

September 23, 1999, the Illinois Supreme Court affirmed Morgan's convictions but vacated his

death sentence and remanded his case to the circuit court for a new sentencing hearing.  *Id.* at

712.  The court reached this decision after finding that Morgan had been denied effective

assistance of counsel at his sentencing because of his trial attorney's failure to investigate and

present mitigating evidence including, most significantly, evidence of Morgan's severe brain

damage.  *Id.* at 711.  On March 20, 2000, the United States Supreme Court denied Morgan's

petition for a writ of certiorari concerning his convictions. *Morgan v. Illinois*, 529 U.S. 1023 (2000).

### d. Successor Petition for Post-Conviction Relief and Petition for Relief from Judgment

On October 19, 2000, while Morgan's re-sentencing was pending on remand before the circuit court, Morgan filed a successor petition for post-conviction relief and petition for relief from judgment (the "Successor Petition") in the circuit court. In his Successor Petition, Morgan asserted that newly-discovered evidence—in particular, the recantation of Elijah Prater's eyewitness testimony—established that he was actually innocent of the crimes for which he had been convicted. *Morgan III*, 817 N.E.2d at 525-26. In support of his petition, Morgan submitted the September 26, 2000 affidavit of Elijah Prater in which he recanted his trial testimony. *Id.* at 526. In his affidavit, Prater stated specifically that one of the two victims had actually been killed by the other, and although Morgan killed the second victim, he had done so out of self-defense. *Id.*

On March 22, 2001, Morgan filed a motion for leave to file an amended successor petition. The amended successor petition included a new allegation that, at the time of Morgan's trial, the State failed to disclose that it provided Phyllis Gregson with favorable treatment on drug charges in exchange for her testimony against Morgan. (Pet. at ¶ 30.) On April 6, 2001, the circuit court granted Morgan's motion for leave to file the amended pleading, but barred Morgan from presenting this new claim at his upcoming evidentiary hearing because it had not been included in the original Successor Petition. (*Id.*)

The circuit court held an evidentiary hearing on Morgan's Successor Petition in September and October of 2001. (*Id.* at ¶ 31.) During the hearing, Prater recanted his trial testimony in open court. *Morgan III*, 817 N.E.2d at 530. According to Prater's revised account,

- 8 -

Motley and Merkson began arguing while they were at Prater's apartment.  *Id.*  Motley struck Merkson with the revolver he had been carrying and then used the gun to shoot Merkson in the head.  *Id.*  When Motley then turned toward Morgan and Prater, pointing the revolver at them, Morgan shot Motley, killing him in self-defense.  *Id.*  It was at this point, after both Merkson and Motley had been killed, that Prater left the apartment to buy alcohol and fill his car with gasoline.  *Id.*  When he returned, Prater helped tie up the bodies and clean up the blood.  Morgan then shot at Prater, as in Prater's initial testimony, and Prater fled from the apartment.

Prater explained that he had initially attempted to tell this version of the story to his police interrogators, but they coerced him into changing his story to implicate Morgan.  *Id.*  In his current petition, Morgan claims specifically that the coercion practiced on Prater involved "an interrogation spanning four days in which he was handcuffed, stripped of clothing as well as threatened with physical violence and prosecution for the murders."  (Pet. at ¶ 5.)

To corroborate Prater's new story, Lemuel Bell, a friend of Prater, was called as a witness at the evidentiary hearing on Morgan's Successor Petition.  *Morgan III*, 817 N.E.2d at 530.  Bell testified that Prater told him that Motley had shot Merkson in his apartment, and that Morgan had "saved the day" by shooting Motley.  *Id.*

On October 29, 2001, the circuit court rejected all of the claims in Morgan's Successor Petition.  Morgan appealed the circuit court's decision directly to the Illinois Supreme Court, claiming that the court erroneously rejected Morgan's actual innocence claim by failing to credit Prater's recantation and refusing to hear Morgan's newly-discovered evidence concerning Gregson's credibility.  (Pet. at ¶ 32.)  On January 10, 2002, the Illinois Supreme Court granted Morgan's motion to stay re-sentencing proceedings pending the disposition of his successive post-conviction appeal. (Pet. at ¶ 33.)

While this appeal was pending before the Illinois Supreme Court, Governor George Ryan granted Morgan clemency in January of 2003. (*Id.*) The Governor commuted Morgan's death sentence so that the maximum sentence available became life imprisonment without parole or mandatory supervised release. *Morgan III*, 817 N.E.2d at 526.

On September 23, 2004, the Illinois Supreme Court denied Morgan's appeal from the denial of the claims in his Successor Petition, rejected Morgan's claim of actual innocence, affirmed his convictions, and ordered that the stay of his new sentencing proceedings be lifted. *Id.* at 533. Morgan filed a petition for a writ of certiorari to the United States Supreme Court, which was denied on February 22, 2005. *Morgan v. Illinois*, 543 U.S. 1167 (2005).

Upon remand to the circuit court for re-sentencing, Morgan filed a comprehensive Memorandum Concerning His Resentencing on July 28, 2005. (Pet. at ¶ 39.) This memorandum, which was accompanied by a three-volume appendix that collected portions of the lower-court record, included mitigating evidence that had never before been presented to a court charged with sentencing Morgan. (*Id.*) On August 1, 2005, the court ordered a new Presentence Investigation Report as well. (*Id.* at ¶ 40.) Then, at a routine status hearing on September 19, 2005, the court sentenced Morgan to natural life imprisonment. (*Id.* at ¶ 41.) Morgan filed a motion to reconsider the circuit court's sentencing order on October 19, 2005, which the court denied on November 22, 2005. (*Id.* at ¶¶ 42-43.) On December 12, 2005, Morgan appealed the circuit court's September 19, 2005 and November 22, 2005 orders, asking the Illinois Appellate Court to vacate his sentence of natural life in prison and remand the matter to the circuit court for a full sentencing hearing. (*Id.* at ¶ 44.) The Illinois Appellate Court rejected Morgan's appeal on August 20, 2007. *People v. Morgan*, 875 N.E.2d 6, 10 (Ill. App. Ct. 2007). Morgan did not file a petition for leave to appeal to the Illinois Supreme Court.

**e. Habeas Petition**

On June 11, 2008, Morgan filed the present habeas corpus petition pursuant to 28 U.S.C.

§ 2254. Morgan's petition includes the following claims:

(1) Morgan was denied due process when the State knowingly introduced Prater's and Gregson's false testimony and represented that this testimony was credible;

(2) Morgan was denied due process when the State failed to disclose:

    a. Gregson's criminal history and the State's promise to treat her favorably with respect to her unrelated arrests if she testified against Morgan;

    b. That Prater's testimony was coerced and Gregson's was false; and

    c. That Prater and Gregson made exculpatory statements to the police regarding Morgan's behavior at the time of the homicides;

(3) Morgan was denied due process when the Illinois courts unreasonably determined the facts related to his claim of actual innocence and specifically refused to find Prater's recanted testimony credible;

(4) Morgan was denied his counsel of choice at trial due to his counsel's frequent absences from critical stages of the trial; and

(5) Morgan's trial counsel was ineffective for:

    a. Failing to investigate or present evidence of Morgan's seizures;
    b. Failing to interview Prater and Gregson, the only two eyewitnesses to Morgan's behavior at the time of the homicides;
    c. Failing to request unrecorded exculpatory witness statements made by Gregson and Prater;
    d. Failing to investigate and present evidence discrediting Prater and Gregson at trial;
    e. Failing to adequately communicate with Morgan or prepare for trial;
    f. Failing to attend critical portions of the trial.

On March 23, 2009, this Court authorized Morgan to conduct limited discovery pursuant

to Rule 6 of the Rules Governing Section 2254 cases. (Dkt. 63.) As a result of information

acquired through that discovery process, Morgan submitted an amendment to his habeas petition

on October 15, 2009. Morgan's amendment specifically added information regarding the

credibility of Prater and Gregson. (Dkt. 77.) On October 16, 2009, Morgan filed a motion for an evidentiary hearing on the facts underlying the constitutional claims asserted in his habeas petition.

## LEGAL STANDARD

A district court shall review a petition for a writ of habeas corpus only when the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. In doing so, "[t]he court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991).

## I.      Exhaustion and Procedural Default

Before a federal court reaches the merits of a habeas petition, the state courts must have had a full and fair opportunity to review the petitioner's constitutional claims. *Farrell v. Lane*, 939 F.2d 409, 410 (7th Cir. 1991), *cert. denied sub nom.*, *Farrell v. McGinnis*, 502 U.S. 944 (1991). To seek federal habeas review, a petitioner must have exhausted all available state remedies (the "exhaustion" doctrine), and, in the course of those proceedings, he must have fairly presented all constitutional claims to the state courts (the "procedural default" doctrine). *See* 28 U.S.C. § 2254(b)(1); *Momient-El v. DeTella*, 118 F.3d 535, 538 (7th Cir. 1997); *Farrell*, 939 F.2d at 410. These requirements are "grounded in concerns of comity and federalism," and accordingly serve to ensure that states have "the first opportunity to address and correct alleged violations of state prisoners' federal rights." *Coleman*, 501 U.S. at 730-31.

Exhaustion requires that petitioners afford the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A petitioner has exhausted

all of his state-court remedies when: (1) he has presented them to the highest court of the state; or (2) no state remedies remain available to the petitioner at the time that his federal petition is filed. *See Farrell*, 939 F.2d at 410.

Reflecting a related requirement, if a petitioner has exhausted his state court remedies without "fairly presenting" his federal claims at each level of state court review, those claims are procedurally defaulted. *See Farrell*, 929 F.3d at 410-11; *see also Momient-El*, 118 F.3d at 538. In addition, a procedural default results when the state court clearly rests its judgment on a state-law ground—substantive or procedural—that is "independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729.

A federal constitutional claim is "fairly presented" when both the "operative facts" and the "controlling legal principles" are submitted to the state court through one complete round of state-court review, either on direct appeal or in post-conviction proceedings. *Gonzales v. Mize*, 565 F.3d 373, 380 (7th Cir. 2009); *see also Momient-El*, 118 F.3d at 539; *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992). In determining whether a claim is "fairly presented," federal courts must take care to "avoid hypertechnicality." *Id.* at 1474. Accordingly, a habeas petitioner need not cite "'book and verse' of the Constitution to present a constitutional claim. *Lieberman v. Thomas*, 505 F.3d 665, 670 (7th Cir. 2007); *Verdin*, 972 F.2d at 1474 (citation omitted). "At bottom, the task of the habeas court . . . is assessing, in concrete, practical terms, whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis." *Id.* at 1476.

A federal court may nonetheless address the merits of a procedurally defaulted claim if (1) the petitioner can demonstrate "cause" sufficient to excuse the procedural default and "actual prejudice" resulting from a failure to obtain review of the merits, *Wainwright v. Sykes*, 433 U.S.

72, 87-88, 97 (1977), or, alternatively, (2) the petitioner persuades the court that failure to entertain the defaulted claim would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004).

## II.    Habeas Standard

Even where a federal court reaches the merits of a petitioner's claim, precedent teaches that habeas relief under § 2254 "is not easy to come by." *Woods v. McBride*, 430 F.3d 813, 816 (7th Cir. 2005). Specifically, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), relief cannot be awarded unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). *See Calloway v. Montgomery*, 512 F.3d 940, 943 (7th Cir. 2008).

Under the "contrary to" clause of § 2254(d), a federal court may grant habeas relief "only if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts." *Woods*, 430 F.3d at 816 (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Williams v. Bartow*, 481 F.3d 492, 498 (7th Cir. 2007).

The second ground for relief under § 2254(d), the "unreasonable application" prong, is particularly difficult to satisfy. *See Woods*, 430 F.3d at 816. A state court's decision reflects an unreasonable application of clearly established law if "the state court identifies the correct rule and unreasonably applies it to the facts, or if the state court unreasonably extends, or refuses to extend, a rule of law." *Bartow*, 481 F.3d at 498 (citing *Taylor*, 529 U.S. at 407-08). In the highly deferential analysis that follows, "a state decision may stand as long as it is objectively

reasonable, even if the reviewing court determines it to be substantively incorrect." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005); *see also Bartow*, 492 F.3d at 498 ("we do not simply ask whether the state court's application was erroneous, or even clearly erroneous, but whether the decision was 'objectively unreasonable'"). A state court's decision is "objectively unreasonable," if it falls "well outside the boundaries of permissible differences of opinion." *Watson v. Anglin*, 560 F.3d 687, 690 (7th Cir. 2009) (citation omitted). On the flip side, a decision is reasonable if it is "at least minimally consistent with the facts and circumstances" of the case. *Williams v. Thurmer*, 561 F.3d 740, 746 (7th Cir. 2009) (citations omitted). During this deferential review process, the state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. § 2254(e)(1); *see also Conner v. McBride,* 375 F.3d 643, 649 (7th Cir.2004).

## ANALYSIS

### I.      Morgan's Motion to Strike

Before turning to Morgan's habeas petition, the Court considers Morgan's motion to strike portions of the State's response to his amendment to that petition. In Morgan's October 15, 2009 amendment, he raised arguments regarding two issues: (1) the State's alleged destruction of photographic evidence that lent credibility to Elijah Prater's recantation, and (2) the State's production of additional arrest and court records for Phyllis Gregson. Morgan argues that the State's response to his amendment improperly addresses issues that lay outside the scope of these two arguments. According to Morgan, sections III and IV of the State's response set forth the same arguments, word-for-word, that the State included in its proposed surreply, despite

the Court's order denying the State leave to file that surreply. Morgan therefore moves the Court to strike sections III and IV of the State's response to his amendment.

As the State points out, the Court entered an order on September 15, 2009 permitting Morgan to file an "amended pleading" and allowing the State to file a "responsive pleading to the amended petition." (Dkt. 76.) The State claims that it interpreted Morgan's "amendment" charitably as an "amended petition" that incorporates his prior pleading, and the State therefore filed the responsive pleading contemplated by the Court's order. The Court agrees that the State's response was appropriate. In habeas proceedings, just as in civil litigation generally, "an amended pleading supersedes the original pleading," erasing facts that were not incorporated into the amended pleading. *Kelley v. Crosfield Catalysts*, 135 F.3d 1202, 1204-05 (7th Cir. 1998); *see Hudson v. Uchtman*, No. 03 C 8699, 2008 WL 4223661, at *4 (N.D. Ill. Sept. 9, 2008). The Court doubts that Morgan intended for his brief amendment to fully supplant his original petition and therefore interprets this amendment as incorporating his previous petition. It follows that the State's broad response to Morgan's amended pleading was permissible. The Court therefore denies Morgan's motion to strike sections III and IV of the State's response.

## II.     Elijah Prater's Recantation

The Court begins by reviewing the state court's rejection of Prater's recantation, as several of Morgan's current claims hinge on this issue. Morgan claims that the state court's rejection of Prater's recantation constitutes an unreasonable determination of facts and defies the clear and convincing weight of the evidence. Morgan also requests an evidentiary hearing to further develop the record on the credibility of Prater's recantation. On habeas review, a petitioner is entitled to relief if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

§ 2254(d)(2).  Under this standard, a petitioner's challenges to a state court's factual determination will not succeed if he simply establishes that the state court committed error; rather, he must establish that the state court committed *unreasonable* error.  *Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003).  The Seventh Circuit recently explained that "the mechanism for proving unreasonableness" is found in § 2254(e)(1), which provides that state-court factual determinations are presumed correct unless the petitioner rebuts this presumption with clear and convincing evidence.  *Ben-Yisrayel v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008); *see also Goudy v. Basinger*, 604 F.3d 395, 399 (7th Cir. 2010) ("Under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence."); *but see Wood v. Allen*, 130 S.Ct. 841, 849 (2010) (reserving "the question of how §§ 2254(d)(2) and (e)(1) fit together" and holding that, because the state court did not make an unreasonable determination of the facts under § 2254(d)(2), the Court did "not need to decide whether that determination should be reviewed under the arguably more deferential standard set out in § 2254(e)(1).")  As characterized by the Seventh Circuit, the standard Morgan faces is "daunting . . . but not insurmountable."  *Ben-Yisrayel*, 540 F.3d at 549.

In 2001, the Circuit Court of Cook County held a three-day evidentiary during which Prater recanted his trial testimony in open court.  Disavowing the trial testimony he offered 18 years earlier, Prater explained that he was coerced by police officers into falsely implicating Morgan for the murders of Merkson and Motley.  According to Prater's revised account, Motley shot Merskon, then turned his gun toward Morgan, causing Morgan to shoot Motley in self-defense.  After considering Prater's in-court testimony, in conjunction with other evidence and witness testimony, the circuit court rejected Prater's recantation as incredible.  The Illinois Supreme Court subsequently upheld the circuit court's determination on the following primary

bases: (1) Prater's recantation was as consistent with the physical evidence as his trial testimony; (2) The State witnesses whose testimony impeached Prater's were more credible than the witnesses whose testimony corroborated Prater's; (3) Gregson's trial testimony corroborated Prater's trial testimony; and (4) The post-conviction trial court deemed Prater incredible after its observations of Prater's demeanor while testifying. *See Morgan III*, 817 N.E.2d 524. Morgan takes issue with both the state court's decision to reject Prater's recantation and the factual findings underlying that decision. In mounting his challenge, Morgan presents essentially the same evidence considered by the state court and asks this Court to reach a different conclusion. With this type of attack, Morgan faces an uphill battle. Although Morgan marshals many convincing arguments in support of Prater's recantation, the Court is mindful of the extremely high threshold Morgan must clear to establish that a state-court factual determination— especially a credibility determination—is unreasonable under § 2254(d)(2). *See Sprosty v. Buchler*, 79 F.3d 635, 643 (7th Cir. 1996) ("The resolution of a factual issue that involves the state trial court's evaluation of the credibility and demeanor of witnesses is one that is accorded particular deference.").

Morgan offers the following arguments in support of his request that this Court disturb the state court's credibility determination. The Court considers whether, in total, these arguments demonstrate that the state court's rejection of Prater's recantation was unreasonable, in defiance of the clear and convincing weight of the evidence. *See* §§ 2254(d)(2), (e); *Ben-Yisrayel*, 540 F.3d at 549.

### a.  Physical Evidence

Morgan argues that the clearest physical evidence corroborating Prater's recanted testimony concerns the state in which the police found Prater's apartment directly after the

homicides, and in particular, the location of Motley's body. Gregson testified at trial that Motley was sitting on a loveseat in Prater's apartment when Morgan fired a shotgun at him from six or seven feet away. According to Gregson, Motley then "flew off the loveseat onto the floor." (Ex. RR at 1013). Prater testified at trial that, seconds after Morgan shot Motley, Prater found Motley lying on the floor bleeding in the bedroom doorway. (Ex. QQ at 767-68.)

Morgan argues convincingly that photographic evidence flatly contradicts this trial testimony, and instead, corroborates Prater's recantation. As Morgan points out, contemporaneous photographs of the scene indicate that there was no blood on the loveseat or anywhere near it, including on the adjacent white walls or the floor. (Ex. TTT at C2288, C2287 C2290.) The photographs depict Motley's body in a pool of blood where the dining room meets the front entranceway, nowhere near the loveseat. (Ex. TTT at C2286, C2287, C2293.) Based on this evidence, which comports with police officers' description of the crime scene upon their arrival, it is certainly difficult to picture that Motley was, in fact, shot while sitting on the loveseat. To reconcile the trial testimony and physical evidence, a fact finder would have to conclude that Motley's body "flew off" the loveseat without releasing a single drop of blood on the loveseat or anywhere near it. Prater's revised testimony does not require such a stretch of the imagination. According to this testimony, Motley got up from the loveseat and began arguing with Merskon in the area where the dining room meets the front entranceway, and it was there that Morgan shot Motley. (Ex. ZZ 229-33; 5/24/02 SR Part 4.)

Morgan next argues that Prater's recantation testimony is more consistent with the medical examiner's report than his trial testimony was. At trial, the medical examiner testified that Merkson was shot in the head from at least eighteen inches away. (Ex. QQ at 979-80.) Offering trial testimony that conflicted with this analysis, Prater explained that Morgan

instructed Merkson to kneel down, put his gun to Merkson's head, and shot him. (*Id.* at 779-80.)
According to Prater's revised testimony, however, Motley (not Morgan) shot Merkson from
some distance away. (Ex. ZZ at 229-32; 5/24/02 SR Part 4.)

Both the state circuit and supreme courts considered and rejected the same arguments
Morgan currently presents to this Court. Upholding the circuit court's rejection of these
arguments, the Illinois Supreme Court stated:

> In urging the circuit court to adopt Prater's current story and to reject the sworn
> testimony Prater has given in the past, defendant argued that the new version was more
> consistent with a number of pieces of physical evidence. These include the lack of blood
> or other bodily fluid on or near the couch on which Motley had been sitting, evidence that
> Merkson was shot from a distance of at least 18 inches, the presence of defendant's
> fingerprint on a dresser drawer in Prater's apartment, and the fact that defendant was
> found in possession of the .357 Magnum handgun and ammunition and the book Motley
> had been looking through while seated on the couch.
>
> The circuit court rejected these arguments. It noted that the absence of blood and other
> bodily fluids on the couch could be explained by testimony given at trial by Gregson that
> Motley's body flew off the couch and landed on the floor nearby after he was shot by
> defendant. Although pools of bodily fluids were later found farther from the couch than
> that, evidence at trial indicated that Prater and Merkson had moved Motley's body after
> Motley was shot and killed.
>
> The forensic evidence indicating that the shot which killed Merkson was fired from a
> distance of at least 18 inches likewise did not contradict evidence at the original trial. To
> the contrary, it was consistent with Prater's original testimony that defendant was four or
> five feet from Merkson when he shot him. The same is true of the other elements of
> physical evidence cited by defendant: the fingerprint, the gun and ammunition and the
> book. Those items did fit in with Prater's new story, but they were also fully consistent
> the sworn testimony that he had given in the past. As a result, they did not demonstrate
> that Prater's new testimony was any more credible than the previous testimony he now
> attempted to recant.

*Morgan III*, 817 N.E.2d at 530-31.

This Court may disagree with these conclusions, and, in fact, I am particularly concerned
with the state court's conclusion that Prater's trial testimony (that Motley was shot while sitting
on the loveseat) can be reconciled with the physical evidence (which clearly indicates that there

- 20 -

was no blood on the loveseat or anywhere in the vicinity). However, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Allen*, 130 S.Ct. at 849. Moreover, the Court's ultimate task is to determine whether, through this and his many subsequent arguments, Morgan presents clear and convincing evidence sufficient to overcome the state court's determination that Prater's recantation was incredible. The Court turns to Morgan's next argument in that vein.

### b. Prater's Claims of Coercion

Morgan argues that Prater's claims of coercion are credible, and as a corollary, the state court erred unreasonably by crediting the police officers' and assistant state attorney's impeaching testimony over corroborating testimony offered by Cynthia Ruwe, Rosemary Thomas, and Lemuel Bell. Prater's claims of police coercion are obviously central to the credibility of his recantation, as a finding that Prater was mistreated by police would explain why he falsely implicated Morgan for both murders at trial.

Rejecting Prater's coercion claim on the basis of the evidence and testimony presented, the Illinois Supreme Court stated:

> We [reject] the testimony presented at the postconviction hearing by Prater's girlfriend, Cynthia Ruwe, and by defendant's former girlfriend, Rosemary Thomas. These witnesses testified regarding matters that occurred at the police station after Prater was in custody, and their testimony was intended to buttress defendant's claim that his original testimony was the product of police coercion. Without going into the specifics of their testimony, we note that neither of these witnesses was independent. They both had personal relationships with Prater or defendant. Moreover, their testimony and the testimony of Prater regarding his interaction with the police following the killings was contradicted by police officers and an assistant State's Attorney who were directly involved in the case. The trial court believed those witnesses. Indeed, it found their testimony to be "compelling, credible, convincing and unimpeached on any material point." It therefore concluded that "there is no credible evidence that * * * Prater was ever coerced by anyone to give false testimony against [defendant] at any time." Credibility determinations of this kind were for the trial court to make, and we have no basis in the record before us for second-guessing its judgment.

Defendant argues that before the trial court deferred to the credibility of the police officers and rejected Prater's claim that he had been coerced, it should have considered evidence that the officers had coerced a different defendant in another, unrelated case several years later. This argument must also fail. The circuit court has wide discretion to limit the type of evidence it will admit at a postconviction evidentiary hearing. *People v. Coleman,* 206 Ill.2d 261, 278, 276 Ill.Dec. 380, 794 N.E.2d 275 (2002). The incident in the other case was distinguishable from this one. It involved a situation where the police denied a defendant access to his attorney, continued to question the defendant after he requested counsel, and subjected him to physical abuse. Unlike the defendant in that case, Prater was not denied access to his attorney, was not questioned after he asked for his attorney, and suffered no physical abuse. The defendant in the other case was beaten. Prater's contention was that he was kept handcuffed and had his clothes taken from him. Given these differences, we cannot say that the circuit court abused its discretion when it refused to admit the evidence from the other case.

*Morgan III*, 817 N.E.2d at 531-32.

Morgan claims that, contrary to the state circuit and supreme courts' decisions, the evidence and testimony offered at his post-conviction evidentiary hearing demonstrate that Prater was coerced. At the evidentiary hearing, Prater testified that he spent more than two days under police interrogation while handcuffed to a wall wearing nothing but a foam garment. (Ex. ZZ at 250-55.) He testified that police officers Whalen and Flynn and Assistant State's Attorney Epach had no interest in his true account of events; rather, they wanted him to testify to the version purportedly offered by Gregson, whom the police had interviewed earlier in the day on January 30. (*Id.* at 256-57, 305, 310-11.) Additionally, Prater testified that the state agents made a number of threats to coerce him into agreeing with the story they fed him. (*Id.* at 250-55.) According to Prater, the police threatened both that they would place him in a cell with the unpredictably violent Morgan and that they would charge him with the murders if he did not accede to their version of events. (*Id.*)

As Morgan points out, the police admit that Prater gave his statement while considered a suspect, after he invoked both his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel. (Ex. AAA at 434-35, 453-54, 467-68, 480, 505-06, 511, 543.) To

bolster Prater's claims of coercion, Morgan highlights the uncontested evidence that Prater's fingernails were clipped while he was in custody. (*Id.* at 444-45.) Morgan suggests that Prater's subjection to such a procedure reveals that Prater was treated as a suspect and undermines the state agents' testimony that Prater remained voluntarily at the police station for several days. Morgan also contends that evidence that the police inventoried his own clothes and placed him in a white paper suit while he was in custody corroborates Prater's claim that he was subjected to a similar procedure. (*Id.* at 478-79, 513-14) Arguing that the state agents lied about the the nature of Prater's stay at the police station, Morgan suggests that they also lied when they repeatedly denied coercing Prater.

Morgan urges that, in addition to rejecting the above arguments improperly, the state court unreasonably dismissed the corroborating testimony of Lemuel Bell, Rosemary Thomas, and Cynthia Ruwe. At Morgan's evidentiary hearing, Bell offered testimony consistent with Prater's claims of coercion and other recantation testimony. Bell testified that, during a conversation he had with Prater before Prater surrendered to the police, Prater told him: (1) he was about to turn himself in to the police (Ex. ZZ at 347); (2) before they were murdered, Motley and Merkson had been planning to stick up Prater and Morgan (*id.* at 346); and (3) Motley and Merkson got into an argument, Motley suddenly shot Merkson, and Morgan stepped in to "save the day" by shooting Motley (*id.* at 346-47). Bell also testified that, shortly after Prater was released from custody, Prater told him that he had been scared and intimidated by the police, and he told the police a story that they wanted to hear. (*Id.* at 347-48.)[2]

---

[2] Additionally, the circuit court did not permit Bell to testify regarding a number of additional facts that Morgan now offers as further corroboration of Prater's recantation. These facts, which were preserved in an offer of proof, are as follows:

    (1) The black address book belonged to Bell, not Motley (*id.* at 360-61);
    (2) The .357 magnum belonged to Bell, who had given it to Morgan before Morgan gave it to Motley (*id.*);

Although the state court did not dismiss Bell's testimony explicitly, the court's implicit rejection of Bell's credibility follows from its finding that Prater's recantation was incredible. Morgan argues that the state court had no reason to discount Bell's testimony, as nothing in the record suggests that Bell was either biased toward Morgan or had reason to fabricate his testimony. Morgan offers only weak support for this argument, pointing out that Bell was never contacted by the police in connection with Morgan's trial, and he neither attended nor testified at the trial. (Ex. ZZ at 356.)

Unlike Bell's testimony, the state court did explicitly find Ruwe and Thomas incredible, noting specifically that "neither of theses witnesses was independent. They both had personal relationships with Prater or [Morgan]." *Morgan III*, 817 N.E.2d at 531. Ruwe, Prater's girlfriend in 1982, testified at Morgan's evidentiary hearing that, when she went to the police station where Prater was held, she could see through a window that Prater was in a room wearing a white dress-like garment that appeared to be made out of a sheet-like material. (Ex. QQQ at 1678-80; 1685-87.) She testified that he was barefoot and was not wearing any clothing underneath the white garment. (*Id.*) Morgan argues that the state court erroneously concluded that Ruwe's testimony was less credible than the state agents' testimony because she was not independent. According to Morgan, if anyone lacked independence, it was the State's witnesses, Whalen, Flynn, and Epach, who met to discuss the case before the evidentiary hearing (Ex. AAA at 498) and shared the common goal of avoiding inquiry into their alleged coercion of Prater.

---

(3) Morgan told Bell that he had met Motley and Merkson when the three of them were in prison together (*id.* at 360);

(4) Morgan told Bell that Motley and Merkson were "stick up men" who should not be trusted (*id.*); and

(5) John Gilbert, also known as "Ba-Ba," and Bell went to Morgan's apartment the night before the killings and saw Gregson and Morgan, and Bell observed no tension between them (*id.* at 361-62). (This testimony, in particular, is consistent with Gregson's testimony at trial that two unnamed black men were in Prater's apartment the night before the killings. (Ex. RR at 994-95.))

At both Morgan's trial and post-conviction evidentiary hearing, police officers Whalen and Flynn and Assistant State's Attorney Epach insisted that Prater's weekend stay at the police station was voluntary. Whalen and Epach, who each interviewed Prater at the police station the day after the homicides, testified at trial that Prater chose to remain at the police station for the weekend out of fear of Morgan. (Ex. RR at 1287, 1339-41.) Arguing that the state court credited this testimony unreasonably, Morgan points out that Prater had no reason to fear Morgan since he personally saw Morgan in custody. (Ex. ZZ at 254, 306, 317-18.) Additionally, Whalen, Flynn, and Epach all knew Morgan was in state custody no later than 3:00 a.m. on Saturday, January 30, 1982, and Morgan suspects that, in all likelihood, they knew that he was in custody even earlier. (*See* Ex. AAA at 391, 393, 398, 521-22, 535; Ex. OOO at 1186-87; Ex. QQ at 561, 583-85.)

Further attacking the state court's credibility determinations, Morgan argues that the state court unreasonably failed to consider evidence that Whalen and Epach, the same state agents who interrogated Prater, coerced another murder suspect. That suspect, Allen Johnson, moved the Circuit Court of Cook County to suppress his statements to police and testified specifically that Whalen and other police officers coerced and beat him, and Epach ignored his requests for counsel. (Ex. SSS at 2013-17, 2020-23, 2027-28.) The circuit court granted Johnson's motion to suppress and found that Johnson had been subjected to mental and physical coercion, and that his Fifth and Sixth Amendment rights had been violated. (*Id.* at 2160-63.) Johnson's interrogation occurred in March 1984 at the Area 6 police headquarters, the same police station where Prater was interrogated. (*Id.* at 1855, 1931, 1999.) Despite the similarities between Johnson's experience and Prater's claims, the circuit court refused to consider evidence relating to Johnson's coercion. The Illinois Supreme Court upheld the lower court's decision, noting that

"[t]he circuit court has wide discretion to limit the type of evidence it will admit at a postconviction evidentiary hearing." *Morgan III*, 817 N.E.2d at 531. The state supreme court explained further that "[u]nlike [Johnson], Prater was not denied access to his attorney, was not questioned after he asked for his attorney, and suffered no physical abuse." *Morgan III*, 817 N.E.2d at 532.

Based on a number of points raised by Morgan, a reasonable jurist may have reached a different conclusion as to the credibility of Whalen, Epach, and Flynn. For example, it is a reach to find that Prater stayed voluntarily at the police station for several days, and the Court's skepticism of the state agents' testimony on that score naturally leads the Court to question their insistence that Prater was not coerced. Nonetheless, given the heightened presumption of correctness afforded to state-court credibility determinations, *see Sprosty*, 79 F.3d at 643, the Court cannot say that clear and convincing evidence establishes that the state court erred unreasonably by favoring the state agents' testimony over that offered by Bell and Ruwe. Nor can the Court conclude that the state court erred unreasonably in determining that Prater was not coerced.

### c. "Otherwise Illogical Behavior"

Offering another reason to find Prater's recantation credible, Morgan argues that Prater's recanted testimony explains his otherwise illogical behavior. According to Prater's trial testimony, after Morgan senselessly shot Motley, Prater left his apartment, and rather than fleeing, calling the police, or otherwise seeking help, he shortly returned to the apartment, where Morgan remained armed. (Ex. QQ at 766-67, 773-75, 879-91.) Morgan argues that Prater's recanted testimony describes a more believable chain of events. At Morgan's evidentiary hearing, Prater testified that he left his apartment to get gas after Morgan saved his life by

shooting Motley, then returned to help take the bodies out of his apartment. (Ex. ZZ at 233-35; 239-40.)

The Illinois Supreme Court rejected this same argument, explaining:

> In further support of Prater's new version of events, defendant argued that it provides a more plausible explanation of Prater's departure and return to the apartment. Plausibility, however, is not the test. The question is whether the new evidence was sufficiently compelling that a decision by the trial court to reject that evidence in favor of the original testimony was manifestly erroneous. That is clearly not the case here. Prater's original explanation for his decision to leave the apartment and return made sense too, and nothing brought to light since the trial suggests that the circuit court erred in refusing to jettison Prater's original explanation in favor of the new rationale he offered.

*Morgan III*, 817 N.E.2d at 531,

This Court agrees with the Illinois Supreme Court's analysis and turns to Morgan's next argument.

### d. Motley's and Merkson's History of Violence

Morgan argues that the state court erred by refusing to consider evidence of Motley's and Merkson's history of violence in support of Prater's recantation. In 1976, Motley was convicted of three separate armed robberies. (Ex. BBB at 594-96; Ex. OOO at 1184, 1208-88; Ex. PPP at 1296-97.) In the first incident, Motley robbed a man at gunpoint of $5 (Ex. BBB at 594-95; Ex. PPP at 1296-97); in the second, he robbed two people at gunpoint of $52, then locked them in the trunk of a car (Ex. BBB at 595; Ex. OOO at 1212, 1247); and in the third incident, he robbed a woman at gunpoint of $10 (Ex. BBB at 595; Ex. PPP at 1302). As a result, Motley was sentenced to four to eight years in prison and served his time at Pontiac Correctional Center from November 1977 to November 1980. (Ex. BBB at 595; Ex. OOO at 1184.) Merkson, for his part, was convicted in 1975 of threatening a man and taking $41 from him. (Ex. BBB at 592; Ex. PPP at 1305-33.) In 1976, he was convicted of robbing another man and threatening him with a deadly weapon. (Ex. BBB at 593.) Merkson was sentenced to eight to fourteen years in prison

and, like Motley, he served his time at Pontiac Correctional Center from July 1977 until May 1981.  (Ex. BBB at 593; Ex. OOO at 1185.)  Morgan claims that he became familiar with Merkson's and Motley's records when the three men were incarcerated at Pontiac Correctional Center at the same time.

In rejecting Prater's recantation, the state circuit court discounted this evidence, and the state supreme court did not reference it in its opinion.  Morgan argues that the state court erred by dismissing the evidence of Motley's and Merkson's proclivity toward violence, despite Prater's testimony that Morgan feared Motley and Merkson because they were stick-up men, the two men were plotting to rob them, and Morgan shot Motley in self-defense.  According to Morgan, evidence of Motley's and Merkson's violent pasts corroborates Prater's recantation and therefore should have been considered by the state courts.  While this evidence, alone, obviously does not constitute clear and convincing evidence that the state court erred by finding Prater incredible, the Court considers Morgan's current argument, along with his others, in ultimately reviewing the state court's rejection of Prater's recantation.

### d.  Additional Evidence—Missing Picture

In addition to the arguments and evidence already considered by the state court, Morgan presents this Court with one new piece of evidence.  In an amendment to his habeas petition (Dkt. 77), Morgan argues that this Court should draw a negative inference from the State's failure to produce a picture taken of Prater at the time of his interrogation.[3]  A January 29, 1982 evidence report indicates that, between 10:30 p.m. and 11:30 p.m. on the same date, police technicians clipped "arrestee" Prater's fingernails and took one ID photo of him.  (*Id.* Ex. A at 7.)  This procedure was performed at Flynn's request (*see id.*), at the same time that he, Whalen,

---

[3] On September 1, 2009, the parties stipulated to the facts underlying this new argument.  (*See* Dkt. 71- Stipulation.)

and Epach were interrogating Prater. (Ex. AAA at 421-422, 490-91; 531-32.) In discovery conducted pursuant to Rule 6 of the Rules Governing Section 2254 Cases, Morgan subpoenaed both the Chicago Police Department and the Cook County State's Attorney's office for a color reprint of the photograph referenced in the January 29, 1982 evidence report. (Dkt. 71 at ¶¶ 1-2.) Neither party could locate this photograph. (*Id.* at ¶¶ 9-12.) Nor was the photograph presented at Morgan's criminal trial or included in the state court record filed during these proceedings. (*Id.* at ¶ 13.)

Morgan correctly points out that, as in other civil cases, a court reviewing a federal habeas petition may draw an adverse inference from the destruction of relevant evidence. *See Smith v. Baldwin*, 510 F.3d 1127, 1155 n. 7 (9th Cir. 2007). Specifically, when a party intentionally destroys evidence in bad faith, the court may draw an adverse inference regarding the substance of the evidence. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). In determining whether evidence was destroyed in bad faith, "the crucial element is not that evidence was destroyed but rather the reason for its destruction." *Id.* (internal citation and quotation marks omitted). Morgan argues that the State had a duty to preserve evidence related to Morgan's prosecution starting in 1982, and the State neglected this duty by destroying the photograph at issue. Morgan expects that this photograph, taken at the time of Prater's interrogation, would corroborate Prater's claims of coercion. He therefore suggests that this Court draw a negative inference that the photograph would have shown Prater without his clothes at the time that Whalen, Epach, and Flynn interviewed him. Such an inference would impeach the testimony of the three state agents, whom the state courts found "compelling, credible, convincing, and unimpeached on any material point," *Morgan III*, 817 N.E.2d at 531, and would lend credibility to Prater's recantation and claims of coercion.

Although the State's failure to produce the photograph at issue may be suspicious, Morgan cannot show that this photograph was destroyed, let alone that it was destroyed in bad faith. Morgan cites no legal basis that permits the Court to draw an adverse inference where a twenty-seven-year-old photograph is simply missing. Because there is no way to know whether the photograph of Prater was lost or destroyed, the Court has no authority to draw the inference that Morgan requests.

### e. Credibility of Prater's Recantation

At the conclusion of Morgan's post-conviction evidentiary hearing, the circuit court delivered its finding that Prater's recantation was not credible. As support for this finding, the circuit court explained that Prater's reasons for allegedly lying in sworn testimony were both "vague and incredible," (Ex. AA at 9) and noted that, since this case's inception, Prater has given sworn testimony or statements five times, including at Morgan's post-conviction evidentiary hearing (*see id.* at 7). Comparing Prater's testimony to the state agents', the court found the state agents' testimony "compelling, credible, convincing, and unimpeached on any material point," while, in contrast, there was "no credible evidence" to support Prater's assertion that the state agents had coerced him to testify against Morgan. (*See id.* at 10.)

After examining the record of Morgan's post-conviction evidentiary hearing, and his arguments on appeal, the Illinois Supreme Court upheld the circuit court's rejection of Prater's recantation, explaining:

> In the end, defendant's postconviction petition turned on a single factor: the credibility of Elijah Prater. Here, as in every case of this kind, it was for the trial court to assess the credibility of the recantation testimony after having observed the demeanor of the witness. The trial judge studied the record, listened to Prater's testimony, and watched how he reacted when he was questioned and cross-examined. Based on our examination of the record, we cannot say that the trial judge's decision to reject Prater's recanted testimony was manifestly erroneous.

*Morgan III*, 817 N.E.2d at 533.

Given that federal courts on habeas review are especially reluctant to upset state-court credibility determinations, *see Sprosty*, 79 F.3d at 643, Morgan's endeavor to challenge several layers of credibility determinations is particularly difficult. (At the first layer, Morgan challenges the state court's determination as to Prater's credibility; delving a layer beneath that determination, Morgan also challenges the state court's findings as to the credibility of the multiple witnesses who either corroborated or contradicted Prater's recantation.) At each level, Morgan confronts the heightened presumption of correctness that attaches to state-court credibility determinations. Ultimately, "[r]easonable minds reviewing the state court record" might reach different conclusions about Prater's credibility, "but on habeas review that does not suffice to supersede the trial court's credibility determination." *See Rice v. Collins*, 546 U.S. 333, 341-342 (2006) (upholding trial court's credibility determination on federal habeas review); *see also Allen*, 130 S.Ct. at 849 ("a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."). Morgan offers many persuasive arguments to support his position that the state court erred unreasonably in finding Prater's recantation incredible. However, despite these arguments, Morgan has not presented the "clear and convincing evidence" necessary to disturb the state courts' credibility finding. *See Ben-Yisrayel*, 540 F.3d at 549. The Court therefore concludes that the state court's rejection of Prater's recantation does not represent an unreasonable determination of facts under § 2254(d)(2).

### f. Morgan's Motion for an Evidentiary Hearing

The Court is satisfied that an evidentiary hearing with respect to the credibility of Prater's recantation is unnecessary. When deciding whether to grant evidentiary hearings, courts are

mindful of the deferential standards prescribed by § 2254 and need not hold hearings on issues that can be resolved on the basis of the state court record. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). In that spirit, AEDPA generally bars evidentiary hearings on federal habeas review except under narrow circumstances. *Ward v. Jenkins*, No. 08-2809, 2010 WL 2867955, at *5 (7th Cir. Jul. 23, 2010). If a petitioner, through his own lack of diligence, fails to develop the factual basis for his claim in state court, he may be entitled to an evidentiary hearing under § 2254(e)(2).[4] *Jenkins*, 2010 WL 2867955, at *5 (citing *Williams v. Taylor*, 529 U.S. 420, 435 (2000)). Where a petitioner's diligence renders § 2254(e)(2) inapplicable, however, he is entitled to an evidentiary hearing under pre-AEDPA standards, which require that: "(1) he has alleged facts which, if proved, would entitle him to habeas relief and (2) the state courts, for reasons beyond his control, never considered his claim in a full and fair hearing." *Jenkins*, 2010 WL 2867955, at *5; *Davis v. Lambert*, 388 F.3d 1052, 1061 (7th Cir. 2004).

The Court is confident that the issue of Prater's recantation can be resolved on the basis of the state court record, *see Schriro*, 550 U.S. at 474, as Morgan has failed to demonstrate that the record is incomplete under either § 2254(e)(2) or pre-AEDPA standards. *See Jenkins*, 2010 WL 2867955, at *5. In fact, the record on this issue is quite comprehensive, as the state court conducted an extensive, three-day evidentiary hearing on the claims in Morgan's Successor

---

[4] § 2254(e)(2), which is inapplicable here, provides:

> **(2)** If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>> **(A)** the claim relies on--
>>> **(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>> **(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>> **(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

Petition. Nevertheless, Morgan argues that an evidentiary hearing is warranted on two primary grounds: (1) "the State court openly showed hostility to Prater's recanted testimony" (Dkt. 80 at 6), and (2) the trial court made conclusory credibility determinations, failed to articulate a reasonable basis for these determinations, and, therefore, there is no way for this Court to determine whether the state court's rejection of Prater's recantation resulted from a full and fair consideration of the relevant evidence.

To support his first argument, Morgan points to the state court's explicit skepticism of recantation testimony. When the circuit court delivered its ruling at the conclusion of Morgan's post-conviction evidentiary hearing, it began by noting: "[r]ecantation testimony has historically been deemed unreliable, and the [c]ourts will usually deny a new trial or other relief in such cases where the [c]ourt is not satisfied that such testimony is true." (Ex. AA at 8.) As the State argues, Morgan fails to explain how the trial court's skepticism of recantation testimony was improper. *See Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000) (noting that "[d]isbelief of recantations is sensible" because "the formality of a court, the presence of the litigants, and the gaze of a judge induce witnesses to hew more closely to the truth than they do when speaking in private and attempting to appease the losing side's advocate.") More importantly, the court's articulation of its skepticism does not indicate that Morgan received an unfair or incomplete hearing. To that end, however, Morgan contends that the circuit court's evidentiary rulings unfairly limited testimony corroborating Prater's recantation. Morgan offers the following examples: (1) The court barred questions to Prater that would have elicited testimony that Morgan told him he knew Merkson and Motley from prison, and Prater told Bell that Motley shot Merkson, causing him to shoot Motley in self-defense; (2) The court barred questions to Flynn as to whether Prater was considered a suspect and whether Flynn knew, when Prater

arrived at the police station on January 29, 1982, if Prater was wearing the same clothes he wore the day before. These examples, alone, are insufficient to demonstrate that Prater was denied a full, fair hearing. The Court therefore turns to Morgan's second primary argument in support of his request for an evidentiary hearing.

Morgan faults the state court for making conclusory credibility determinations, thus leaving this Court without means to evaluate whether these determinations stemmed from a full and fair consideration of the evidence. Specifically, Morgan notes that the state court deemed Prater incredible without much elaboration, and when delivering this finding, the court failed to mention the corroborating testimony offered by Ruwe or Bell. While Morgan's observations are accurate, the state court's failure to explain its credibility determinations in detail is not grounds for an evidentiary hearing under either § 2254(e)(2) or pre-AEDPA standards. Although the state court did not make explicit findings with respect to Bell's or Ruwe's credibility, the court implicitly found them incredible (or at least less credible than the state agents), given its ultimate decision to reject Prater's recantation. Such implicit credibility determinations are afforded the same presumption of correctness as explicit determinations under § 2254(e)(1). *See Campbell v. Vaughn*, 209 F.3d 280, 286, 290 (3d Cir. 2000) ("implicit finding of fact is tantamount to an express one, such that deference is due to either determination") (citing, *inter alia*, *Parke v. Raley*, 506 U.S. 20, 35 (1992); *Marshall v. Lonberger*, 459 U.S. 422, 432-33 (1983); *LaVallee v. Delle Rose*, 410 U.S. 690, 692 (1973) (per curiam)). As discussed at length in the preceding sections, Morgan has failed to present the clear and convincing evidence necessary to disturb the state court's credibility findings on habeas review. And because Morgan cannot establish that he was denied a full, fair evidentiary hearing in state court, this Court must uphold the state court's credibility determinations on the basis of the state court record.

### g. Habeas Petition Counts I, II, & III

Because this Court is bound to uphold the state courts' rejection of Prater's recantation testimony, Morgan's habeas claims are denied to the extent that they require a finding that Prater's recantation testimony was truthful. In Count I of his habeas petition, Morgan claims that he was denied due process when the State knowingly introduced Prater's and Gregson's false testimony and represented that this testimony was credible. In Count II, Morgan claims that he was denied due process when the State failed to disclose several pieces of material exculpatory evidence, including the fact that Prater's trial testimony was coerced. The portions of Count I and II that assume Prater's recantation was credible must be denied. Count III, which claims that Morgan was denied due process when the state court failed to consider his recanted testimony, is denied it its entirety.

## III. Phyllis Gregson's Criminal History

The Court next turns to the issue of Phyllis Gregson's undisclosed criminal history. At trial, the primary evidence against Morgan was delivered through the eyewitness testimony of Prater and Gregson. In his habeas petition, Morgan now reveals that Gregson received favorable treatment on two drug charges before testifying against him. Gregson's favorable treatment on these charges was never disclosed at trial, and despite Morgan's repeated requests, the State did not produce Gregson's complete criminal record until the current habeas proceedings. As the facts below demonstrate, the State has repeatedly provided inaccurate and incomplete information about Gregson's criminal history over the course of the past twenty-eight years. The facts related to Gregson's arrest record are critical to several of Morgan's current claims—his claim that a *Brady* violation resulted from the State's failure to disclose Gregson's criminal history and favorable treatment by the State (Count II), and his claims that the State knowingly

used false testimony to obtain Morgan's convictions and made false representations to the jury regarding Gregson's credibility (Count I). Arguing that the factual predicate for these claims was never developed in state court due to no fault of his own, Morgan requests an evidentiary hearing on the facts related to Gregson's arrest records.

Morgan's understanding of Gregson's criminal record has unfolded over the years as follows. Before his trial, Morgan filed a Motion for Discovery and Inspection, specifically asking the State to disclose "[a]ny record of prior criminal cinvictions [sic] or prior criminal arrests which may be used for impeachment of the defendant or any person whom the State intends to call as witnesses [sic] at the hearing or trial of this cause." (Ex. EEEE at 1129-30.) On April 16, 1982—three months after the January 1982 deaths of Motley and Merkson and approximately a year before Morgan's April 1983 trial—the Chicago Police Department arrested Gregson and charged her with one count of possession of a controlled substance and one count of possession of marijuana. (*Id.* at 1117.) Less than one month later, on May 4, 1982, the police again arrested Gregson and charged her with two counts of possession of a controlled substance and one count of possession of marijuana. (*Id.* at 1123.) This time, she was arrested with Larry Froio, who was charged with the same offense. (*Id.*) Froio's and Gregson's arrest reports indicate that both appeared in court to address their May 4, 1982 charges on May 27, 1982. (*Id.* at 1123, 1127.) According to Froio's criminal history and arrest report, the matter was continued until either August 26 or 27, 1982. (*Id.* at 1125, 1127.) Froio's arrest report indicates that, in August 1982, he pled guilty and was sentenced to six months' supervision on the charges. (*Id.* at 1125.) Although Gregson's arrest report does not indicate the disposition of her felony charges, Froio related in an interview with Morgan's defense investigator that both he and Gregson agreed to six months' supervision in exchange for their guilty pleas. (*Id.* at 1085, 1143.)

According to Gregson's arrest report for her April 1982 arrest, the State decided to *nolle prosequi* her drug charges on June 16, 1982. (*Id.* at 1121.) Two days later, on June 18, 1982, the State filed its Answer to Discovery in which it listed Gregson as a witness and stated: "The People have no knowledge at this time that any of its potential witnesses have any criminal convictions." (Ex. EEEE at 1139.) The State made no mention of Gregson's April or May 1982 arrests or her previous arrest on a drug-related charge in 1981. Additionally, the State never filed an updated discovery answer disclosing the August 1982 disposition of Gregson's May 1982 charges.

Only a slice of Gregson's criminal history was revealed at trial. On April 26, 1983, the first day of Morgan's trial, Morgan's trial counsel reported to the court that the State had provided a Bureau of Identification ("B of I") Sheet[5] indicating that a "primary witness" had a May 4, 1982 arrest for possession of a controlled substance, and he was unable to obtain any additional information about the arrest. (Ex. PP at 460.) On the fourth day of Morgan's trial, before Gregson testified, Assistant State's Attorney Lonnie Schultz related that he called the CPD criminal section that morning and learned that there was no new entry on Gregson's B of I sheet, she had attended drug school for her May 1982 arrest, and that arrest was expunged from her record. (Ex. QQ at 919.) (Although the charges related to Gregson's May 1982 arrest were in fact nol-prossed, that disposition was not revealed at trial.) Neither Morgan's trial counsel nor the State made Gregson's B of I sheet part of the record, and Morgan's trial counsel did not retain a copy of the document. During the jury instruction conference, which was conducted the week after Gregson testified, ASA Schultz successfully argued that the court had no basis to give a "testimony of an addict" instruction with regard to Gregson. (Ex. RR at 1357-58.)

---

[5] A B of I sheet is a criminal defendant's "rap sheet' indicating his criminal history.

Twelve years later, when Prater told Morgan's counsel that he had perjured himself at Morgan's trial, Morgan began to investigate Gregson's possible motives for lying. (Ex. DD at 31.) It was at this point that Morgan's renewed discovery efforts led him to obtain Gregson's criminal record, which revealed Gregson's two arrests for possession of a controlled substance between the time of the homicides and Morgan's trial. After repeatedly claiming that the then-nineteen-year-old arrest reports no longer existed, the CPD finally produced these reports. (Ex. EEEE at 1083-84, 1121, 1123.) The reports indicated that Gregson's April 1982 arrest was later nol-prossed but failed to reveal the disposition of Gregson's May 1982 arrest. (*Id.* at 1085, 1121, 1123.) Morgan never had the opportunity to confront Gregson directly about her undisclosed criminal history, as Gregson passed away in 1995. However, because Gregson's arrest reports showed that she was arrested along with Larry Froio in May 1982, Morgan's counsel subpoenaed Froio's arrest records and later deployed an investigator to interview him in February 2001. (*Id.* at 1085.) Until the instant proceedings, Morgan believed Froio's statement that both he and Gregson agreed to six months' supervision in exchange for their guilty pleas. (Ex. EEEE at 1085, 1143.)

Then, on April 17, 2009, the State produced yet new documents related to Gregson's criminal history in response to a subpoena issued pursuant to Rule 6 of the Rules Governing Section 2254 Proceedings. The new documents indicate, for the first time, that the State not only nol-prossed the charges arising from Gregson's April 1982 arrest; the charges arising from her May 1982 arrest were nol-prossed as well. (Dkt. 77 Ex. 1.) (Of course, one of the newly produced documents indicates that Gregson's May 1982 charges were nol-prossed on August 26, 1982, while another seems to indicate that these charges were nol-prossed on November 23,

1982.)  The State further produced a B of I sheet with "drug school" handwritten next to the May

4, 1982 arrest.  (Dkt. 71 Ex. C.)

      While the information that first became available during post-conviction proceedings

indicated that the charges arising from Gregson's April 1982 arrest were nol-prossed, and those

arising from her May 1982 arrest resulted in six months' supervision, the post-conviction trial

court refused to consider this evidence.  (Ex. XX at 155-56.)  On appeal, the Illinois Supreme

Court upheld the lower court's refusal for reasons that are mystifying.  The court explained:

> More problematic is the disposition of the unrelated criminal charges filed against
> Gregson shortly after the murders. There were two arrests. The first, for possession of a
> controlled substance, was nol-prossed by the State. The second, for possession of illegal
> drugs, apparently resulted in a sentence of six months' supervision. Such information
> should have been disclosed to defense counsel at the time of trial, but was not. Once
> again, however, we note that there is no apparent reason this problem could not have
> been explored and raised earlier in the history of these proceedings. The records invoked
> by defendant have been on file for two decades.
>
> In addition, the actual significance of the criminal charges is questionable. Defendant
> looks to those charges and the way they were disposed of by the State as providing a
> motive for Gregson's decision to incriminate defendant. As the State points out, however,
> Gregson had a much more compelling and entirely legitimate motive for testifying
> against defendant. She did not do it to garner a favorable disposition of her drug charges.
> She did it because defendant had kidnapped and raped her, and she wanted to insure that
> he was punished.

*Morgan III*, 817 N.E.2d at 533.

      While the Illinois Supreme Court noted that the State's failure to disclose the disposition

of Gregson's criminal charges at trial was "problematic," the Court rationalized the lower court's

refusal to consider this evidence on two grounds: (1) Gregson's records have been available for

two decades, and it is somehow Morgan's fault that the State did not properly respond to

Morgan's discovery requests or turn over these records in a timely manner; and (2) Rather than

testifying against Morgan to secure favorable treatment on her drug charges, Gregson had a

"more compelling and entirely legitimate motive" driving her testimony—her desire to ensure

that Morgan was punished since he kidnapped and raped her.  The first ground requires little discussion.  As detailed above, Morgan's ongoing efforts to secure Gregson's criminal records began before his trial, and for nearly three decades, these efforts have been met repeatedly by the State's incomplete and inaccurate disclosures.  The second ground provided by the Illinois Supreme Court relies on entirely circular logic.  Discounting the possibility that Gregson offered false testimony to secure favorable treatment on her drug charges, the court explains nonsensically that Gregson had a better reason to lie about her rape and kidnapping: the fact that she was raped and kidnapped (and, thus, was motivated to see Morgan punished).  The Illinois Supreme Court's odd reasoning aside, the fact remains that no state court ever considered the impact of Gregson's criminal history and favorable treatment by the State on Morgan's convictions.

Against this backdrop, the Court now considers Morgan's motion for an evidentiary hearing on the facts surrounding Gregson's criminal history.  Morgan's diligence in developing the record on this issue, as detailed above, renders § 2254(e)(2) inapplicable.  *See Jenkins*, 2010 WL 2867955, at *5.  Accordingly, under pre-AEDPA standards, Morgan is entitled to an evidentiary hearing if "(1) he has alleged facts which, if proved, would entitle him to habeas relief and (2) the state courts, for reasons beyond his control, never considered his claim in a full and fair hearing."  *Davis v. Lambert*, 388 F.3d 1052, 1061 (7th Cir. 2004).

Morgan readily satisfies the second prong of this analysis.  As described above, Morgan attempted to bring this issue—along with his then-incomplete information—to the state court's attention, but the state court refused to consider it.  Satisfying the first prong is a bit more difficult.  In essence, Morgan seeks to develop the facts surrounding Gregson's criminal history and alleges that the criminal records unearthed during these proceedings indicate that Gregson

received favorable treatment in exchange for her testimony against Morgan.  The question is whether, if Morgan could establish the existence of such an exchange, he would be entitled to relief.

Morgan claims that the State's failure to disclose Gregson's criminal charges and the favorable treatment she received on these charges constitutes a *Brady* violation.  It is well-established that the suppression of material evidence favorable to the defendant violates due process.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  To establish a *Brady* violation, the defendant must prove three elements: "(1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, 'materiality.'"  *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008).  All of the action in this case occurs in the context of the third prong.  Morgan must prove that the evidence suppressed was material in that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Carvajal*, 542 F.3d at 567 (quoting *Stricker v. Greene*, 527 U.S. 264, 281 (1999)).

With respect to the first prong, it is uncontroversial that a key witness's criminal history, and her favorable treatment on contemporaneous charges, represents classic impeachment material.  *See Giglio v. United States*, 405 U.S. 150 (1972).  Moreover, drug convictions are particularly relevant, as drug use and addiction have "an important bearing upon the credibility of a witness."  *People v. Pitchford*, 731 N.E.2d 323, 330 (Ill. 2000) (internal citation and quotation marks omitted).  That Morgan satisfies the second prong is uncontested; there is no doubt that the State suppressed Gregson's criminal history.

The Court therefore turns to the pivotal question—whether there is a reasonable probability that the outcome of Morgan's trial would have been different if the State had indicated that Gregson received favorable treatment on drug charges in return for testifying against Morgan. *See Carvajal*, 542 F.3d at 567. The Court analyzes this question differently with respect to each of Morgan's convictions. Beginning with Morgan's murder and kidnapping convictions, the Court cannot say that there is a reasonable probability that disclosure of the evidence at issue would have changed these convictions. In addition to Prater's testimony against Morgan (which the Court is bound to uphold, as discussed above), independent witnesses and physical evidence supported Morgan's convictions for these offenses. For instance, upon arriving at Prater's apartment, the police found a fingerprint on a dresser drawer that was later identified as Morgan's. *See Morgan I*, 492 N.E.2d at 1308. A motel employee testified that he initially observed Morgan pointing a large, silver-plated revolver at Gregson's head and later observed him pushing Gregson into a car headfirst. *See id.* Additionally, when the police approached Morgan the day after the murders, he attempted to elude capture, first walking away, then turning and pointing his revolver at them. *See id.* When the police succeeded in arresting Morgan, they recovered the revolver that had fired bullets in Prater's apartment and a black notebook that Prater and Gregson identified as the book Merkson had given to Morgan after he removed it from Moteley's body. *See id.* Given this evidence, and especially Prater's corroborating eyewitness testimony, the Court cannot conclude that there is a reasonable probability that evidence impeaching Gregson would have undermined Morgan's murder and kidnapping convictions.

The analysis is more difficult, however, with respect to Morgan's rape conviction. Morgan's rape conviction rested entirely on Gregson's credibility, as her testimony about the

rape was barely supplemented by any physical evidence or medical reports. (*See* Ex. RR at 1039-41.) Impeachment aside, Gregson's testimony was weak to begin with and revealed conduct at odds with her rape claim. After she was supposedly hit and punched by Morgan and witnessed two murders, Gregson never attempted to leave Prater's apartment, although she had ample opportunity to do so. (Ex. RR at 988-1154, 1006-07, 1012-27.) When Morgan and Gregson arrived at a motel shortly after leaving the murder scene, Gregson stood idly in the lobby as Morgan checked in. (Ex. RR at 1136-38.) Gregson testified that, upon reaching the motel room, she started watching television, and she and Morgan spent approximately half an hour in the room before Morgan said he wanted to have sex with her. (*Id.* at 1141.) Gregson never testified that Morgan used force to have sex with her, or that she put up any physical resistance. (*Id.* 1139-46.) Additionally, while a motel employee testified that he saw Morgan point a gun at Gregson, Gregson never said that. (*Id.* at 1042-43, 1148, 1194.) (In any event, the motel employee's testimony may support Morgan's kidnapping conviction, but the question is whether it supports the rape conviction.) When Morgan left Gregson on a street corner after the two had left the motel, she did not go to a hospital or police station. (*Id.* at 1046-47, 1148-52.) Instead, she hailed a cab and went home. (*Id.*)

Evidence developed after trial casts doubt on Gregson's testimony that Morgan raped her.[6] In connection with Morgan's re-sentencing, Gregson submitted an affidavit dated December 31, 1994, in which she stated that Morgan "was always a gentleman. He was quite [sic] and friendly. He never said anything rude or sexual to me." (Ex. DDDD at 987.) Admittedly, the context for this statement renders its meaning somewhat unclear; Gregson may

---

[6] Morgan argues that Prater's recantation testimony undermines his rape conviction. Prater testified that Gregson told him that Morgan never raped her, that she had agreed to have sex with Morgan, and that the police told her during her interrogation that if she said Morgan raped her, it would help put him in jail. (Ex. ZZ at 258-59; 264.) The Court, however, must reject this evidence since we uphold the state court's determination that Prater's recantation testimony was incredible.

have intended this statement simply as a description of Morgan's usual personality, in contrast to her subsequent statement that Morgan "became like another person" and "[h]is personality totally changed" on the night of the murders. (*Id.*)

In any event, Gregson's credibility at trial was crucial to Morgan's rape conviction, as her testimony was the only evidence of Morgan's rape. As the Supreme Court has held, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." *Giglio*, 405 U.S. at 154 (internal citation and quotation marks omitted). Gregson's criminal charges, and the favorable treatment she received on those charges right before Morgan's trial, go straight to the heart of her credibility. The jury's evaluation of Gregson's credibility was incomplete without this evidence. Moreover, the State compounded the effect of its failure to disclose this evidence by emphasizing Gregson's credibility in closing (*see* Ex. RR at 1455, 1468-69, 1473) and prevailing on its argument that Morgan was not entitled to a "testimony of an addict" instruction with respect to Gregson (*see id.* at 1357-58).

Despite that, this Court concludes that there is no reasonable probability that Morgan would not have been convicted of rape if the State had disclosed evidence indicating that Gregson received favorable treatment on her drug charges in exchange for her testimony against Morgan. Even if Morgan could establish the existence of such an agreement between the State and Gregson, he still would not be entitled to habeas relief with respect to his rape conviction. It strains logic to suggest that Gregson was induced to lie about a false rape by an alleged agreement to drop a few minor drug charges. At trial, Gregson testified that, after Morgan committed two brutal murders, he kidnapped her, struck, and punched her, before raping her. The motel employee testified that he saw Morgan point a gun at Gregson and throw her headfirst

into a car.  That testimony alone corroborated much of Gregson's testimony about the circumstances leading up to and after the rape.  The Court cannot say that the state court's resolution of this issue was unreasonable.  Accordingly, the Court denies habeas relief with respect to Morgan's claim that a *Brady* violation resulted from the State's failure to disclose evidence of Gregson's criminal history at trial (Count II(a)).

The Court now turns to Morgan's claim that his due process rights were violated when the State knowingly used Gregson's false testimony to obtain Morgan's convictions (Count I).  Even if Morgan is able to establish that Gregson received favorable treatment in exchange for her testimony against him, that does not mean that Gregson's testimony perjured, and Morgan does not identify evidence revealing such a link.  The Court therefore denies habeas with respect to the remaining portion of Count I—Morgan's claim that the State knowingly used Gregson's false testimony to secure his conviction.

The only aspect of Count II that remains to be addressed is Morgan's claim that a *Brady* violation occurred when the State failed to disclose exculpatory statements made by Prater and Gregson.  This claim relates closely to Morgan's claim that his counsel's failure to request unrecorded exculpatory statements constituted ineffective assistance.  The Court therefore considers Morgan's remaining *Brady* claim with its related ineffective assistance claim below.

## IV.  Ineffective Assistance of Counsel

Morgan claims that he was denied effective assistance of counsel at his trial in a number of ways.  After Morgan's mother hired Lawrence Levin to serve as Morgan' trial counsel in exchange for her life savings of $10,000, (*see* Ex. DDDD at 463), Levin failed to conduct any pre-trial investigation and was absent during key parts of Morgan's trial.  As a result of his failure to perform any investigation, Levin never discovered that Morgan suffers from severe

brain damage—a condition that likely affected his behavior at the time of the crimes.  When Levin showed up on the first day of Morgan's trial, he informed the court that he was unprepared to proceed and felt burned out from trying two other murder trials immediately before Morgan's.  Despite Levin's concerns, the court insisted that the trial move forward as planned.  Levin then simply failed to show up for critical stages of the trial, leaving Morgan in the inexperienced hands of his associate, Steven Decker.  Morgan asserts several grounds to support his claim that he was denied effective assistance of counsel.  The Court addresses each in turn.

### a.  Strickland Standard

To establish ineffective assistance of counsel under *Strickland v. Washington*, a petitioner must show that (1) his trial counsel's performance "fell below an objective standard of reasonableness," and (2) prejudice resulted.  466 U.S. 668, 687-88 (1984).  With respect to the first prong, review of trial counsel's performance "must be highly deferential," and a petitioner must overcome "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Johnson v. Lofton*, 518 F.3d 453, 457 (7th Cir. 2008) (quoting *Strickland*, 466 U.S. at 689).  To demonstrate prejudice under the second prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  The *Strickland* Court defined "a reasonable probability" as "a probability sufficient to undermine confidence in the outcome."  *Id.* at 694; *Ben-Yisrayl v. Buss*, 540 F.3d 542, 547 (7th Cir. 2008).  A court "need not address both components of the inquiry if the defendant makes an insufficient showing on one."  *Strickland*, 446 U.S. at 697.  In particular, if a petitioner fails to demonstrate prejudice, the court can dispose of his claim without first evaluating trial counsel's performance.  *See id.*

The bar a habeas petitioner must clear to establish that the state court unreasonably applied *Strickland* is even higher.  *See Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006).  On top of *Strickland*'s deference to trial counsel's method of conducting the litigation, "§ 2254(d)(1) adds a layer of respect for a state court's application of the legal standard." *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997).  Moreover, because the constitutional question in *Strickland* "calls for inquiry into degrees," which "requires balancing rather than a bright-line approach, . . . only a clear error in applying *Strickland*'s standard would support a writ of habeas corpus." *Id.* at 882; *see also Stevens v. McBride*, 489 F.3d 883, 906 (7th Cir. 2007).

### b.  Failure to Present Evidence of Morgan's Seizures

To support his ineffective assistance of counsel claim, Morgan first asserts that his trial lawyer, Levin, erred by neglecting to investigate or present evidence of Morgan's history of seizures despite his awareness of Morgan's condition.  Specifically, Morgan claims that Levin should have interviewed his mother and girlfriend—the two individuals closest to him—about his mental condition.  The State argues that Morgan procedurally defaulted this claim by failing to fully present it through one round of state-court review.  According to the State, Morgan argued before the state supreme court only that trial counsel was ineffective for failing to present evidence of Morgan's seizures at sentencing—not that trial counsel should have presented this evidence at the guilt phase.

In fact, Morgan raised the current claim in both the post-conviction trial court (*see* Ex. L at 33-35) and the Illinois Supreme Court (*see* Ex. Q at 61-65).  Before the Illinois Supreme Court, Morgan argued specifically that "[t]he *Strickland* jurisprudence concerning the Sixth Amendment right to effective assistance of counsel discussed above in the sentencing context . . . applies with equal force at the guilt phase of the trial."  (*Id.* at 61.)  Morgan then proceeded to

explain that Levin's failure to gather evidence of Morgan's brain damage prevented him from asserting a mental state defense at trial. (*See id.* at 61-62.) As the record indicates, this claim is not procedurally defaulted. The merits of this subclaim relate closely to Morgan's next subclaim— that Levin failed to interview the two eyewitnesses to Morgan's behavior. Together, these subclaims amount to an assertion that Levin failed to perform the research and investigation necessary to assert a mental state defense on Morgan's behalf. The Court will therefore consider the merits of this subclaim in conjunction with Morgan's next subclaim, addressed below.

### c. Failure to Interview Prater & Gregson

Morgan claims that Levin was constitutionally ineffective because he failed to interview Prater or Gregson, and this failure prevented him from presenting a defense that (1) Morgan did not kill Merkson, (2) he killed Motley in self-defense and defense of others, and (3) he lacked the requisite mental state to commit murder. Because Morgan has met both the exhaustion and procedural requirements for asserting this claim, the Court may address its merits.

Analysis of the instant claim requires some background information. Morgan initially presented this claim in his first post-conviction petition. After reviewing that petition, the circuit court dismissed all claims without an evidentiary hearing, with one exception. The court granted an evidentiary hearing on Morgan's claim that Levin's failure to present mitigation evidence about his brain damage at sentencing constituted ineffective assistance of counsel. After considering the testimony of Morgan's sister and several experts about the abuse Morgan suffered as a child and his history of brain damage, the circuit court concluded that Levin's performance at Morgan's sentencing did not amount to ineffective assistance of counsel.

Morgan appealed the denial of this claim and several other claims of ineffective assistance of counsel to the Illinois Supreme Court. *Id.* at 697.

Before considering Morgan's current ineffective assistance claim—that Levin failed to investigate and present a mental state defense—and Morgan's ineffective assistance claim stemming from Levin's failure to present certain mitigation evidence at sentencing, the Illinois Supreme Court recounted the evidence presented at Morgan's evidentiary hearing below. At the hearing, Morgan's sister, Ruby Roberts, testified that their mother severely beat Morgan from the age of 3 to 16, and Morgan routinely suffered seizures as a child. *Id.* at 694. Next, Dr. Jonathan Pincus, the former chairman of neurology at Georgetown University and chief of neurology of Georgetown University Hospital, testified that Morgan sustained permanent and extensive brain damage as a child, and there was a "definite link" between Morgan's history of criminal conduct and his brain damage. *Id.* at 694-95. In addition, Dr. Pincus opined that, at the time of the murders, Morgan was experiencing a paranoid or psychotic state in which he could neither control what he was doing nor think clearly. *Id.* at 695. Finally, Daniel J. Rybicki, a clinical psychologist who had met with Morgan, testified that Morgan suffered from permanent brain damage that caused him to suffer from paranoid ideation and impaired his ability to think in logical sequences. *Id.* at 695-96. The State's only witness was Levin, who testified that he had little recollection of his representation of Morgan. *See id.* He stated, however, that his interactions with Morgan did not indicate that Morgan was suffering from any mental impairments or brain damage. *Id.*

After reviewing the record of the evidentiary hearing in the circuit court, the Illinois Supreme Court concluded that Levin's failure to present any evidence of Morgan's brain damage at his sentencing constituted ineffective assistance of counsel and ordered re-sentencing.

However, the Illinois Supreme Court affirmed the circuit court's denial of Morgan's other ineffective assistance claims.  In particular, while reviewing the circuit court's denial of Morgan's post-conviction petition, the court addressed Morgan's claim that "because counsel was ineffective in failing to present evidence of defendant's brain damage and neurological impairments, defendant's sole 'defense' was to imply that the State's two witnesses to the murder, Phyllis Gregson and Elijah Prater, were not believable and were accomplices to the crimes." *Id.* at 698.  The court considered whether Levin would have mounted a different defense if he had conducted a more thorough investigation in preparation for Morgan's trial.  Such an investigation would have revealed evidence of Morgan's brain damage and testimony by Prater, Gregson, and Morgan's girlfriend, Rosemary Thomas, that Morgan's strange behavior on the night of the murders reflected his mental impairments.  Morgan argued that this additional evidence would have enabled Levin to present a mental state defense such as intoxication, self-defense, or voluntary manslaughter based upon an unreasonable belief in self-defense and/or sudden and intense passion.  *Id.* at 698-99.  Analyzing each defense separately, the court considered whether Morgan made a substantial showing that there is a reasonable probability that he would not have been convicted of first-degree murder had Levin presented the defense in question.  *Id.* at 699-701.  The court rejected each defense in turn and concluded that Levin's failure to gather evidence of Morgan's mental impairments, and his failure to present testimony from Prater, Gregson, or Thomas, did not amount to ineffective assistance of counsel.  *Id.* at 699.

Mapping the Illinois Supreme Court's analysis, this Court will consider Morgan's first two claims of ineffective assistance of counsel together— Levin's failure to gather and present evidence of Morgan's brain damage, including his seizures, and his failure to interview and present testimony from Thomas, Prater, and Gregson.  At issue, then, is the state court's

conclusion that Levin was not constitutionally ineffective when he neglected to investigate and present a mental state defense on Morgan's behalf.   This Court reviews the state court's decision under § 2254(d) and concludes that the Illinois Supreme Court's rejection of Morgan's present ineffective assistance claim was neither contrary to nor an unreasonable application of clearly established United States Supreme Court law.

The state supreme court cited and correctly identified the *Strickland* standard, *see id.* at 698, and the its resolution of Morgan's ineffective assistance claim did not result from an "unreasonable application" of *Strickland* within the meaning of § 2254(d)(1).   Under *Strickland*'s directive to determine whether a trial lawyer's alleged deficiencies prejudiced his client, the state supreme court considered each mental state defense Morgan identified.   The court concluded that, because none of Morgan's proposed defenses would have been successful, Morgan was not prejudiced by Levin's failure to investigate and present those defenses.

Before addressing each of Morgan's proposed defenses, the court summarized the testimony Morgan proposes to have offered in support of a mental state defense.   The court stated, in relevant part:

> Defendant, in his brief to this court, primarily cites to various passages from the affidavits of Gregson and Prater, including that defendant "flipped out" the night before the shootings, that defendant "snapped in and out of periods of extreme paranoia," that defendant believed "devils and demons" were after him, and that all four men in the apartment were "drinking whisky, smoking marijuana, * * * snorting cocaine" and possibly taking PCP during the time preceding the murders. Defendant also relies upon statements in Prater's affidavit that during the time in the apartment, defendant "appeared extremely threatened by [the victims]," that Motley made "at least five telephone calls throughout the night" in which he "whispered privately" so that no one else could hear, and that defendant stayed awake all night "because he believed that Motley and Merkson were going to kill him." Defendant additionally relies upon the affidavit of his girlfriend, Rosemary Thomas, that defendant called her several times from Prater's apartment, that he "sounded very strange" and that he told her that "devils and demons were after him." Finally, defendant cites to the affidavit of his longtime friend, Van J. Ross, who visited defendant at the police station shortly after his arrest for the murders and avers that a

police officer in charge of the lockup stated that defendant had been acting "crazy" and "weird."

*Morgan II*, 719 N.E.2d at 531-32.

Considering both the affidavits summarized above and the evidence of Morgan's mental impairments, the Illinois Supreme Court proceeded to analyze Morgan's proposed mental state defenses. First addressing the defense of intoxication, the court concluded that Morgan "failed to make a substantial showing that there is a reasonable probability that the outcome of his trial . . . would have been different had defense counsel raised the defense of intoxication." *Id.* at 532. In reaching this decision, the court recognized that, although voluntary intoxication is not normally a defense to a crime, "evidence that the intoxication was so extreme as to suspend the power of reason may be used to negate the existence of the mental state which is an element of the crime." *Id.* (citation omitted). The court went on to find that "nowhere in the affidavits relied upon by defendant is there evidence that defendant's purported intoxication was so severe that he could not form the requisite intent to support a first degree murder conviction." *Id.* Moreover, to the extent that the jury considered evidence that Morgan consumed drugs and alcohol around the time of the murders, that evidence did not alter the jury's finding of culpability. *Id.*

The state court's conclusion does not represent an "objectively unreasonable" application of *Strickland* to the degree required for this Court to grant relief under §2254(d)(1). The evidence presented at trial indicated that Morgan acted deliberately by firing his shotgun at Motley, ordering Merkson to sink to his knees and shooting him with a revolver, and repeatedly directing Prater and Gregson to clean up the bodies. *Morgan I*, 492 N.E.2d at 1307-08. Other evidence introduced at trial established that, after murdering Motley and Merkson, Morgan forcibly took Gregson to a motel, checked in under an alias, raped her, then dropped her off by the side of the road, warning her not to tell anyone what had happened. *Id.* at 1308. Based on

- 52 -

this evidence, the state court's finding that Morgan's intoxication was not "so extreme as to suspend the power of reason," *see Morgan II*, 719 N.E.2d at 732, was "within the range of defensible positions." *Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003).

The Court recognizes that Morgan identifies significant evidence of intoxication in his present petition. For example, during the state-court proceedings, Prater and Gregson both testified that Morgan consumed alcohol, cocaine, marijuana, and mushrooms throughout the time leading up to the murders. (Ex. QQ at 715, 761, 839, 857; RR at 993-94). In addition, the experts who testified at Morgan's first post-conviction evidentiary hearing explained that Morgan's consumption of drugs and alcohol enhanced the effect of his brain damage and further impaired his mental capacity. *Morgan II*, 719 N.E.2d at 695-96. Despite this evidence, under the highly deferential standard of review imposed by AEDPA, this Court cannot grant relief if the state court's evaluation of Levin's failure to present an intoxication defense is "at least minimally consistent with the facts and circumstances of the case." *Thurmer*, 561 F.3d at 746. Because the state court's decision meets this low threshold, the Court finds that the state court's application of *Strickland* to Levin's failure to investigate and present an intoxication defense was not "unreasonable" within the meaning of §2254(d)(1).

After considering Morgan's proposed intoxication defense, the Illinois Supreme Court next evaluated Morgan's likelihood of success if he had argued that he acted in self-defense, in an unreasonable belief in the need for self-defense, or under a sudden heat of passion resulting from serious provocation. *Id.* at 699-700. The court ultimately rejected these defenses as well, finding that Morgan failed to make a substantial showing that there is a reasonable likelihood that the result of his trial would have been different if he had claimed he acted in self-defense. *Id.* After listing the requirements for raising a self-defense claim, the court explained that

Morgan failed to offer sufficient evidence to satisfy these requirements. *Id.* In particular, Morgan did not provide any evidence that "at the time of the shootings, either Merkson or Motley made any threats of use of unlawful force against [him] that would lead a person to reasonably believe that there was an imminent danger of death or great bodily harm that required the use of deadly force in self-defense." *Id.* at 700. Supporting its conclusion, the court noted that the undisputed evidence presented at trial established that Motley was shot while sitting on the couch, Merkson was shot after complying with Morgan's instructions to kneel on the floor, Morgan was armed when both murders occurred, and Merkson was unarmed. *Id.*

The Illinois Supreme Court next considered and rejected Morgan's claim that he made a substantial showing that he was prejudiced by Levin's failure to seek an instruction for voluntary manslaughter—which would have been available if: (1) Morgan had an actual but unreasonable belief that the circumstances warranted his use of deadly force in self-defense, or (2) the killing occurred while he was under sudden and intense passion resulting from serious provocation. *Id.* (citing Ill. Rev. 1983, ch.38, pars. 9-2(a), (b)). To earn a voluntary manslaughter instruction based on an unreasonable belief in the need for self-defense, a defendant must present some evidence that unlawful force was used against him, and that he was not the initial aggressor. *Id.* at 700-01. The court concluded that Morgan suffered no prejudice from Levin's failure to ask for this instruction based on the absence of evidence that either victim used unlawful force against him, and the evidence indicated that Morgan was the initial aggressor. *Id.* at 701. Next, the court noted that Morgan was not prejudiced by Levin's failure to request a voluntary manslaughter instruction on the basis that Morgan murdered Motley and Merkson while acting under a sudden and intense passion resulting from serious provocation. *Id.* Rejecting this defense, the court noted that state law recognizes certain specific categories of "serious

provocation," and Morgan offered no evidence suggesting that any of these types of provocation compelled him to murder Motley or Merkson.  *Id.*

In finding that Morgan was not prejudiced by Levin's failure to assert any of the above permutations of a self-defense claim, the Illinois Supreme Court did not apply *Strickland* unreasonably under § 2254(d).  First, the fact that neither Motley nor Merkson used or threatened unlawful force against Morgan precludes a generic self-defense claim.  Second, with respect to a claim of unreasonable belief in self-defense, Morgan suggests that he could have established this defense by presenting evidence of his brain damage and testimony from individuals including Prater, Gregson, and Thomas about his strange behavior, paranoia, and drug use at the time of the murders.  However, despite this evidence, Morgan cannot establish that either Motley or Merkson used force against him, and the evidence presented indicates that he was the initial aggressor.  Because Morgan cannot meet these prerequisites for a voluntary manslaughter instruction based on an unreasonable belief in justification, the court's finding that he was not prejudiced by Levin's failure to request such an instruction was not unreasonable.  Finally, the court's decision that Levin's failure to seek an instruction on voluntary manslaughter based on killing sparked by "serious provocation" was not unreasonable given Morgan's failure to introduce evidence of "serious provocation."

The Illinois Supreme Court's conclusion that Levin's failure to investigate and assert a mental state defense did not prejudice Morgan does not reflect an unreasonable application of *Strickland.*  Indeed, the court's evaluation and rejection of each mental state Morgan identifies in his petition was "at least minimally consistent with the facts and circumstances" of the case.  *Thurmer*, 561 F.3d at 746.  Because the Illinois Supreme Court's decision was not "well outside

the boundaries of permissible differences of opinion," *Watson v. Anglin*, 560 F.3d 687, 690 (7th Cir. 2009) (citation omitted), the Court cannot grant habeas relief on this claim.

### d.  Failure to Request Exculpatory Witness Statements

Morgan next claims that he was denied effective assistance of counsel when Levin failed to request unrecorded exculpatory witness statements taken by the State.  According to Morgan, such a request would have revealed statements in support of the mental state defenses discussed above.  Specifically, these statements include Gregson's statement that Morgan was afraid of Motley and Merkson and Prater's description of drastic changes in Morgan's behavior just before the killings.  Morgan has met both the exhaustion and procedural requirements for asserting this claim.  Addressing the merits, the Court agrees with the State that the Illinois Supreme Court's resolution of this claim does not represent an "unreasonable application" of *Strickland* under §2254(d)(1).

When the Illinois Supreme Court addressed this claim, it concluded that Morgan "failed to make a substantial showing that he was prejudiced by counsel's failure to specifically request unrecorded witness statements." *Morgan II*, 719 N.E.2d at 702.  The court noted, first, that Levin filed a comprehensive motion for discovery that encompassed the type of statements Morgan claims the State should have turned over. *Id.*  The court proceeded to state that it did "not discern a reasonable probability that the result of defendant's trial would have been different had these alleged unrecorded statements been introduced" because neither exculpatory statement would have been sufficient to support the rejected mental state defenses discussed above. *Id.* at 702-03.

The Illinois Supreme Court cited and correctly articulated the *Strickland* standard, *see id.* at 698, and the court's application of *Strickland* was not unreasonable within the meaning

- 56 -

contemplated by § 2254(d)(1).  The court's finding that Levin's motion for discovery included the exculpatory statements at issue defeats Morgan's claim that Levin was deficient for failing to request these statements.  Moreover, the state court's conclusion that Morgan could not establish prejudice due to the omission of these statements from trial was not unreasonable.  Even if these statements—Prater's description of Morgan's erratic behavior and Gregson's statement that Morgan feared Merkson and Motley—had been admitted at trial, Morgan's claims of self-defense or unreasonable belief in the need for self-defense would not have been any more likely to succeed.  As explained above, the absence of any evidence demonstrating that Morgan was not the initial aggressor defeats these defenses.  Because the state court's resolution of the instant claim does not stem from an unreasonable application of *Strickland*, habeas relief cannot be granted on this claim.

### e. Morgan's Related *Brady* Claim—The State's Failure to Disclose Exculpatory Witness Statements

Although slightly out of context beneath the "ineffective assistance of counsel" heading, the Court now considers Morgan's claim that a *Brady* violation resulted from the State's failure to disclose certain exculpatory witness statements.  The exculpatory statements at issue are: (1) Prater's statement, during his January 30, 1982 police interrogation, that Morgan had forced himself to stay awake the night and morning of January 27 and January 28, 1982 because he believed that Motley and Merkson intended to kill him, and he stayed awake by repeatedly making calls to his girlfriend, Rosemary Thomas, and (2) Gregson's statements, during her January 30, 1982 police interview, that (i) Morgan was always a gentleman and never said anything rude or sexual to her; (ii) she was afraid of Motley and Merkson; and (iii) Prater was selling drugs out of his apartment.  Morgan claims that these statements would have provided critical support for his proposed claims of self-defense or unreasonable belief in self-defense.

Morgan also claims that Gregson's statement that Morgan was always a gentleman and never said anything rude or sexual to her would have significantly undermined the State's case that he was guilty of rape and kidnapping.

Immediately after rejecting Morgan's ineffective assistance claim based on counsel's failure to request unrecorded exculpatory statements, the Illinois Supreme Court rejected Morgan's related *Brady* claim. The court held, specifically:

> As stated above, on this record defendant has failed to make a substantial showing that there is a reasonable probability that the statements made by Gregson and Prater concerning defendant's behavior at the time of the offenses would have affected the outcome at the guilt-innocence phase of defendant's trial. Accordingly, we reject defendant's claim.

*Morgan II*, 719 N.E.2d at 703. This Court concludes that the Illinois Supreme Court correctly articulated the applicable *Brady* standard and did not apply that standard unreasonably. In particular, the state court's determination that the statements were not material to the outcome of Morgan's trial was not unreasonable. This conclusion follows directly from the Court's rejection of Morgan's ineffective assistance claims based on Levin's failure to present a mental state defense or witness statements that would have supported such a defense. For the same reasons that these claims were rejected, habeas relief is denied with respect to Morgan's claim that the State violated *Brady* by failing to disclose statements about his behavior the night of the murders.

In addressing Morgan's current claim, the Illinois Supreme Court did not explicitly consider whether the State violated *Brady* by failing to disclose Gregson's statement that Morgan was always a gentleman and never said anything rude or sexual to her. The State currently argues that Morgan procedurally defaulted this portion of his *Brady* claim. This argument is mistaken. In both his first post-conviction petition, and his appeal from the denial of that petition, Morgan asserted that the State's failure to disclose this precise statement was improper.

(*See* Ex. L at 29; Ex. Q at 17). Nevertheless, this claim fails on the merits. Because the Court cannot say that there is a reasonable probability that disclosure of this statement would have changed the jury's decision to convict Morgan for rape or kidnapping, *see Carvajal*, 542 F.3d at 567, the Court must deny relief on this portion of Morgan's claim as well.

### f. Failure to Investigate or Present Evidence Discrediting Two Eyewitnesses

Morgan's fourth ground for his claim of ineffective assistance of counsel is that Levin failed to investigate the background of Prater and Gregson, the only two eyewitnesses to the killings. Morgan argues that such an investigation would have revealed that both Prater and Gregson were drug dealers, and he could have used this information to challenge their credibility at trial. According to Morgan, he was particularly prejudiced by Levin's deficiency in this regard since Morgan's only defense at trial was that Prater and Gregson (not Morgan) had committed the homicides, and this defense was neither fully investigated nor developed.

The State argues that this claim is procedurally barred because, although Morgan presented this claim in his first post-conviction petition, he never presented it to the state supreme court. The record shows otherwise. In Morgan's brief to the Illinois Supreme Court, he argued that Levin was ineffective because he "did not attempt to develop any evidence" for the only defense presented at trial—that the State's two eyewitnesses, Prater and Gregson, committed the murders for which Morgan was charged. (Ex. Q at 68.) In support of this claim, Morgan cited cases where failure to contact or interview witnesses constituted ineffective assistance of counsel. (*See id.*) Although Morgan's claim before the state supreme court was more general than the claim in his first post-conviction petition, fair presentment "does not require hypertechnical congruence between the claims made in federal and state courts." *Anderson v. Benick*, 471 F.3d 811, 814-15 (7th Cir. 2006) (internal citation omitted). Because

Morgan afforded the state supreme court sufficient notice to pass on this claim, it is not procedurally defaulted. However, after addressing the merits, the Court finds that Morgan is not entitled to relief on this claim.

Morgan complains that Levin failed to obtain evidence discrediting Prater and Gregson, despite the fact that Morgan's entire defense was based on the theory that Prater and Gregson had committed the murders, not Morgan. According to Morgan, had Levin simply talked to Rosemary Thomas (Morgan's girlfriend) and Prater, he would have learned that Prater and Gregson were drug dealers. (*See* Ex. DD at 895 ¶ 15, 898 ¶ 2.) Morgan argues that Levin also could have established that Prater, Merkson, and Motley were collecting drug payments (*see id.* at 885-86 ¶ 3), not just running errands (*see* Ex. QQ at 816) during the time leading up to the murders. Ultimately, Morgan contends, evidence that Prater and Gregson were drug dealers would have altered the jury's view of their credibility and undermined the key eyewitness testimony they delivered to inculpate Morgan.

Morgan's current claim fails because he cannot establish that, had Levin presented additional evidence regarding Prater's and Gregson's backgrounds—including their drug dealing, in particular—there is a reasonable probability that the outcome of Morgan's trial would have been different. *See Strickland*, 466 U.S. at 689. Most notably, at trial, Levin established that both Prater and Gregson had a history of using drugs, and that both had used drugs on the night of the murders. (*See* Ex. QQ at 711, 715, 761, 798-99, 838-39, 850, 857; RR at 994, 1021-22, 1062-63, 1068, 1075-77, 11544-45.) Levin also discredited Prater's and Gregson's testimony in multiple other ways. For example, Levin cross-examined Prater about a shotgun that Merkson had retrieved from Prater's bedroom closet, which Prater claimed he had never seen. (*See* QQ at 802, 807, 841-43.) Levin also elicited Prater's admission that, once Morgan

had supposedly threatened Prater with the shotgun, causing Prater to fear for his life, Prater did not call the police, leave his apartment, or ask Morgan to leave.  (*See id.* at 846-48.)  Prater also admitted that, after Morgan killed Motley, he left the apartment but did not attempt to call the police and was not upset about the shooting.  (*See id.* at 879-81.)  As to Gregson, Levin elicited testimony that, even though Morgan had beaten her, and she witnessed him kill Merkson, she did not attempt to escape from the apartment, nor did she attempt to call for help.  (*See* Ex. RR at 1089-90, 1091-93, 1116-17, 1123-24, 1153.)  Under Levin's cross-examination, Gregson also admitted that, once Morgan released her, she waited two days before going to the police.  (*See id.* at 1066-67, 1149.)  The record demonstrates that, even if Levin had investigated Prater's and Gregson's backgrounds and impeached them with evidence of their drug use and sales, there is no reasonable probability that the outcome of Morgan's trial would have been different. Accordingly, the Court cannot grant habeas relief on Morgan's current claim.

### g.  Trial Counsel's Absences and Insufficient Performance

As a final ground for his ineffective assistance claim, Morgan argues that he suffered prejudice due to Levin's periodic absences from trial, Decker's insufficient substitution, and both lawyers' overall deficient performance.  The State argues that Morgan procedurally defaulted the portion of his claim focused on Decker's failure to compensate for Levin's absence.  That argument is unavailing.  In Morgan's first post-conviction petition, he argued that he was prejudiced by Levin's absences.  (*See* Ex. L at 31.)  Morgan renewed this argument on appeal from the denial of his post-conviction petition, and this time, he added specifically that Decker's substitution did not make up for Morgan's absences.  (*See* Ex. Q at 67 n.21.)  Even though Morgan did not explicitly complain about Decker's performance in his post-conviction petition, his argument that he suffered prejudice due to Levin's absence necessarily implies that Decker's

substitution was insufficient. Moreover, the state court could not have determined whether

Levin's absence prejudiced Morgan without considering whether Decker provided effective

assistance in Levin's place. The Court rejects the State's attempt to artificially separate

consideration of Levin's absences from Decker's substitution and therefore concludes that

Morgan has not procedurally defaulted either aspect of his ineffective assistance claim.

Moving onto the merits, Morgan argues first that prejudice is presumed under *United

States v. Cronic*, 466 U.S. 648 (1984), in light of Levin's absences during critical stages of the

trial. Even if prejudice is not presumed, Morgan contends, he can prove that he was prejudiced

by "the piecemeal performance of Levin and Decker at trial." (Pet. at ¶ 178.) Morgan complains

that Levin failed to conduct any pre-trial investigation or prepare for trial, the court knew that

Levin was burned out and unprepared, but insisted on proceeding with the trial anyway, and

Levin ultimately failed to appear in court during critical portions of the trial. In addition,

Morgan claims that Levin's absences left his life in the hands of Decker who, for his part, was

inexperienced and unprepared, had never met with anyone close to Morgan about trial strategy,

and repeatedly protested when the judge insisted that the trial proceed despite Levin's

(sometimes unexpected) absences.

The Illinois Supreme Court rejected Morgan's instant claim and supporting arguments,

explaining:

> Defendant next contends that Levin was distracted from defendant's trial due to outside
> obligations, resulting in Levin rendering ineffective assistance of counsel. According to
> defendant, the record indicates that Levin was fully occupied with other matters, both
> before and during defendant's trial, and his inattentiveness to defendant's case explains
> counsel's lack of preparation, investigation, and strategic planning. In support of this
> claim, defendant cites to a comment made by Levin in response to the trial court judge's
> query whether there was any reason that Levin could not proceed with defendant's case
> immediately after he completed another criminal trial. Levin informed the judge that
> although he had been trying two criminal cases simultaneously during the prior three

weeks, he could think of no reason why he could not immediately start defendant's trial, "save for the burnout factor."

Defendant further contends that Levin's preoccupation with other matters did not cease when defendant's trial commenced. According to defendant, because Levin was absent from the courtroom at many critical stages of the trial, defendant was left "effectively unrepresented." Although Levin's assistant, attorney Steven Decker, was present in the courtroom on the occasions when Levin was absent, defendant contends that Decker's presence cannot excuse Levin's absences. Additionally, defendant notes that Decker had not filed an appearance on defendant's behalf.
. . .

[W]e find that defendant has failed to make a substantial showing that he suffered prejudice as a result of Levin's courtroom absences.

We have repeatedly held that when a defendant claims ineffective assistance of counsel based upon allegations that counsel was distracted due to personal and professional circumstances, the defendant must establish that, absent these distractions, there is a reasonable probability that the outcome of defendant's trial would have been different. Defendant, citing to a footnote in *United States v. Cronic,* 466 U.S. 648, 659 n. 25 (1984), contends that the prejudice caused by Levin's absences is a "foregone conclusion." Defendant's reliance on *Cronic* is misplaced. The portion of the *Cronic* decision on which defendant relies states: "The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. at 659 n. 25. The record indicates that Levin and Decker were acting in concert as defendant's counsel, and that defendant was never without representation throughout the course of his trial. Aside from defendant's misplaced citation to *Cronic*, defendant offers neither argument nor evidence that he was prejudiced by Levin's absences from the courtroom. Therefore, we reject defendant's claim.

*Morgan II*, 718 N.E.2d at 701-02 (citations omitted).

Morgan argues that the Illinois Supreme Court erred by refusing to apply *Cronic* to his current claim. *Cronic* was the companion case to *Strickland* and held that, under certain circumstances, a criminal defendant need not make the showing required by *Strickland* to establish that he was denied effective assistance of counsel. *Cronic*, 466 U.S. at 658-59. For instance, a trial is presumptively unfair if the defendant's lawyer is totally absent during a critical stage of the proceeding. *Id.* at 659. Morgan argues that the Illinois Supreme Court should have applied *Cronic* to his ineffective assistance claim since Levin missed many key parts of his trial.

- 63 -

Urging that Levin's many absences warrant a presumption of prejudice, Morgan contends that Decker's presence was insufficient to compensate for Levin's absences.

When Morgan's trial was due to begin, Levin informed the court that he had been continuously on trial for the three weeks leading up to Morgan's trial, and he had not been able to prepare for Morgan's case. (Ex. PP at 63-64.) He further expressed concern that starting Morgan's trial on the heels of another significant murder case would burn him out. (*Id.*) Nevertheless, the court dismissed Levin's concerns and ordered that the trial go forward as planned. (*Id.* at 68.) Although Levin showed up for the start of jury selection, he failed to return after a lunch break, without notice to the court or Morgan. (*Id.* at 345-46.) In Levin's absence, Morgan was left in the hands of Decker, who agreed to continue with jury selection, but otherwise requested that the court delay the trial until the next day. (*Id.* at 346-47.) The court denied Decker's request and forced him to proceed with the opening statement and first witnesses—Prater's downstairs neighbor who had called the police when the bullet came through his ceiling, and the police officer who first arrived at the homicide scene. (*Id.* at 347-48.) The following day, Levin again failed to appear, to the surprise of both Decker and Morgan. (Ex. QQ at 550-52.) When the court asked Morgan if he knew Levin would be absent, Morgan replied, "just at the present, I am just becoming of aware of it." (*Id.* at 551.) Nevertheless, the court insisted that the trial move forward. In addition to opening statements and the beginning of the trial, Levin also ended up missing several other parts of the trial. In particular, Levin missed the cross-examinations of (1) the police officer who sponsored photographs of the crime scene (including the photograph of the loveseat without blood on it), (2) the police officer who arrested Morgan and had the opportunity to observe Morgan's physical and mental state shortly after the killings, and (3) two employees of the Shore Drive Motel, who also had the opportunity to

observe Morgan's physical and mental state shortly after the murders. Levin also missed Decker's motion for a mistrial (*id.* at 596), motion for a directed verdict (Ex. RR at 1260-61), and twice left Decker in the lurch when the state's attorney overcame Decker's objections to evidence by claiming that the State had previously disclosed the evidence to Levin (*id.* at 1199; Ex. QQ at 555). In sum, Levin was absent during part of the voir dire, opening statements, arguments as to the admissibility of certain evidence, and the examination of seven State witnesses.

Morgan argues that the Illinois Supreme Court improperly justified its refusal to apply *Cronic* (and presume prejudice from Levin's absences) by affording undue weight to Decker's substitution for Levin. Although present in Levin's absence, Decker was not Morgan's trial counsel. As of one week before Morgan's trial, he was apparently uncertain whether he would even be assisting Levin with the trial. (*See* Ex. PP at 54.) Although he proceeded to participate in Morgan's trial, Decker never filed a formal appearance in Morgan's case. According to Morgan, Decker's mere physical presence in the courtroom does not defeat the applicability of *Cronic* to this case. Morgan perhaps overstates his argument when he suggests that Decker contributed no more than his physical presence to Morgan's trial. In any event, the Court cannot say that the Illinois Supreme Court erred by applying *Strickland* here instead of *Cronic*. As the State points out, Supreme Court precedent has limited *Cronic*'s application—and consequent presumption of prejudice that—"to cases where counsel is *physically* absent at a critical stage." *McDowell v. Kingston*, 497 F.3d 757, 762 (7th Cir. 2007) (citing Supreme Court cases) (emphasis in original). Because Decker represented Morgan in Levin's absence, Morgan's case does not fall within the exceedingly narrow ambit of *Cronic*. Accordingly, the Illinois Supreme Court properly applied *Strickland* in lieu of *Cronic*.

The question now becomes whether the Illinois Supreme Court concluded unreasonably that Morgan failed to demonstrate prejudice under *Strickland*. Morgan argues that prejudice resulted the moment Levin left during jury selection and missed his first opportunity to establish rapport with the jury. According to Morgan, he was further prejudiced when Levin's repeated absences conveyed the implicit message that Levin was conceding Morgan's guilt. Morgan argues additionally that Levin's absence during prosecution testimony undermined his lone trial strategy—to discredit the State's witnesses.

When considering these arguments, the Illinois Supreme Court concluded that Morgan failed to establish that he suffered prejudice as a result of Levin's absences—in other words, that there is no reasonable probability that the outcome of Morgan's trial would have been different without Levin's absences. *See Morgan II*, 718 N.E.2d at 701-02. Under the deferential standard applicable on habeas review, *see Taylor*, 448 F.3d at 948, the Illinois Supreme Court's conclusion was not unreasonable under § 2254(d). The record shows that, during the trial, Levin served as Morgan's primary counsel, conducted the direct examination of two of the three defense witnesses (*see* Ex. RR at 1264-1326, 1335-44), cross-examined the State's two key eyewitnesses, Prater and Gregson (*see* Ex. QQ at 795-903; Ex. RR at 988-1154), and delivered the closing argument (*see* Ex. RR at 1423-52). In Levin's absence, Decker conducted jury selection (*see* Ex. PP at 345-462), delivered the opening argument (*see id.* at 463-472), conducted the direct examination of one defense witness (*see* Ex. RR at 1326-44) and cross-examined several of the State's witnesses (*see* Ex. RR at 1162-1168; 1181-89, 1202-18, 1220-21). In doing so, Decker advanced the defense theory that the State could not prove beyond a

reasonable doubt that Morgan had committed the crimes for which he was charged.[7]  Morgan has

not shown that the state court erred unreasonably in concluding that the outcome of his trial

would have been any different if Levin had been present during the parts of the trial conducted

instead by Decker.  Ultimately, the Court concludes that the Illinois Supreme Court did not

unreasonably apply *Strickland* when it held that Morgan was not prejudiced by Levin's periodic

absences from trial, Decker's substitution, or both lawyers' overall performance.  Accordingly,

Morgan is not entitled to habeas relief on the basis of his current ineffective assistance of counsel

claim.

## V.  Denial of Counsel of Choice

Finally, Morgan argues that he was denied his right to his counsel of choice in violation

of the Sixth Amendment because Levin, the lawyer he retained, was absent from critical stages

of the trial, leaving Decker to represent Morgan in Levin's absence.  Morgan argues that the

court's forced substitution of Decker for Levin fails to satisfy Morgan's constitutional right to

counsel of his choice.  Morgan has procedurally defaulted this claim, and, therefore, the Court

may not address its merits.

A petitioner must "fairly present" his federal claims to the state's courts before a federal

court may address those claims on habeas review.  *See Farrell*, 939 F.3d at 411; *see also*

*Momient-El*, 118 F.3d at 538.  Fair presentment requires the petitioner to submit both the

"operative facts" and the "controlling legal principles" to the state court through one complete

round of state-court review.  *Gonzales v. Mize*, 565 F.3d 373, 380 (7th Cir. 2009); *see also*

*Momient-El*, 118 F.3d at 539; *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992).  As a

---

[7] For example, Decker attempted to impeach a State witness and police officer with inconsistencies in their
testimony (*see* Ex. PP at 489-502; Ex. QQ at 526-43); Decker objected throughout Officer Dudek's testimony (*see*
Ex. QQ at 559, 560, 574, 575, 577); Decker cross-examined the manager of the hotel where Morgan brought
Gregson, challenging evidence of her rape (*see* Ex. RR at 1181-89); and Decker challenged the motel clerk's
identification of Morgan (*see* Ex. RR at 1202-18).

corollary to this principle, a petitioner cannot fairly present a claim by introducing a legal theory he did not offer during the state court proceedings—even if that theory stems from "operative facts" that he did submit.  *See Badelle v. Correll*, 452 F.3d 648, 661 (7th Cir. 2006); *Wilks v. Israel*, 627 F.2d 32, 38 (7th Cir. 1980); *see also Momient-El*, 118 F.3d at 539 (quoting *Verdin*, 972 F.2d at 1479) ("The legal basis upon which a petitioner seeks relief must be fairly presented to the court: '[f]ederal judges will not presume that state judges are clairvoyant.'").

While seeking review in state court, Morgan laid out the "operative facts" underlying his claim that he was denied counsel of choice, including the facts that Levin missed key parts of his trial and that Decker—sometimes spontaneously—took his place.  However, Morgan introduced these facts only in the context of his claim of ineffective assistance of counsel.  (*See* Ex. L at 31-32; Ex. Q at 65-68.)  Morgan never indicated any intention to marshal these facts in support of his claim that he was denied counsel of his choice.  He thus failed to present the "controlling legal principles" underlying his present claim.

Morgan argues that he did, in fact, present the legal framework for his current claim.  According to Morgan, his assertion of a Sixth Amendment violation based on Levin's absences at trial (and Decker's insufficient substitution) involved "an implicit assertion of a right to counsel claim." (Dkt. 54- Reply in Supp. of Pet. at 10.)  In addition, Morgan argues that the state supreme court addressed the issue of Morgan's choice of counsel when it concluded that Levin and Decker had acted "in concert," thus rendering *United States v. Cronic*, 466 U.S. 648 (1984), inapplicable to Morgan's ineffective assistance of counsel claim. (Reply at 10 (citing *Morgan II*, 719  N.E.2d at 702.))

Morgan's purportedly "implicit assertion of a right to counsel claim" and his citation to the Illinois Supreme Court's analysis of his ineffective assistance claim fail to satisfy the fair

- 68 -

presentment requirement. Although fair presentment "does not require hypertechnical congruence between the claims made in federal and state courts," the fair presentment requirements exists to ensure the state courts "a meaningful opportunity to pass on the claims later presented in federal court." *Anderson v. Benick*, 471 F.3d 811, 814-15 (7th Cir. 2006) (internal citation omitted). Although Morgan did present the "operative facts" of his current claim to the state courts, he presented these facts to support his ineffective assistance claim and failed to tie them to his current claim of denial of right to counsel. Because Morgan never afforded the state courts a meaningful opportunity to consider his right-to-counsel claim, this claim is procedurally defaulted. Furthermore, Morgan fails to demonstrate either cause or prejudice to excuse his default, and he cannot establish that his conviction resulted from a miscarriage of justice. Accordingly, this Court may not consider the merits of Morgan's claim that he was denied counsel of his choice.

## VI.     Certificate of Appealability

Once a district court rejects a § 2254 petition, the court may issue a certificate of appealability to the petitioner. *See* Rule 11(a), Rules Governing Section 2254 Cases (Eff. Dec. 1, 2009). The court may do so only if "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). If a court denies a petition on procedural grounds, a petitioner must show that both the procedural ruling and the underlying constitutional claim are debatable. *Id.* at 484. The record in this case is troubling and convoluted. Because a reasonable jurist may find the Court's decisions with

respect to Morgan's constitutional claims debatable, the Court grants a certificate of appealability on all claims Morgan raises in his habeas petition.

## CONCLUSION

For the reasons stated above, Morgan's motion to strike portions of the State's response to his amendment to his habeas petition is DENIED, Morgan's motion for an evidentiary hearing is DENIED, and Morgan's petition for a writ of habeas corpus is DENIED.  The Court grants a certificate of appealability on all claims raised in Morgan's habeas petition.


Enter:
/s/ David H. Coar

_____

David H. Coar
United States District Judge


**Dated:** August 30, 2010